PETERS CREEK UNITED
PRESBYTERIAN
CHURCH

v.

WASHINGTON PRESBYTERY OF PENNSYLVANIA and Reverend L. Rus Howard and Robert J. Elmes, Richard L. St. Clair, Mary G. St. Clair, Harry R. Broberg, Ona D. Broberg, Janet DeGrange, Ronald A. DeGrange, John M. McMurray, Claire V. Agarwal, Marian H. Jochem, Ramarkrishna Agarwal, Clark L. Gable, Sue Smith, Carol Gable, Audrey Vanderaar, William D. Harmon, Judy Mayer, George E. Mayer, Ph.D., Jan Fickter, Betty N. Monaghan, Edward L. Miller, Ruth Lewis, James L. Simpson, Kevin L. Scrivo, Ardeth D. Simpson, William B. Philips, Christine Scrivo, Vickie Philips, W. Bennett Lewis, Jill

A. Brower, Louise H. Carmichael, Mary Anne Harmon, J.W. Carmichael, Jackson Brower, James P. Leslie, Jr., Rose Marie Leslie, Rebecca Harmon Schreiber, William Shades, Keith C. Shader, Cathy Shader, Albert C. Broberg, Karen C. Broberg, together constituting the "True Church" of Peters Creek United Presbyterian Church, and on behalf of all other members of the congregation

v.

Peters Creek United Presbyterian
Church.

Appeal of: Washington Presbytery
of Pennsylvania.

Peters Creek United Presbyterian
Church

v.

Washington Presbytery of Pennsylvania and Reverend L. Rus Howard and Robert J. Elmes, Richard L. St. Clair, Mary G. St. Clair, Harry R. Broberg, Ona D. Broberg, Janet DeGrange, Ronald A. DeGrange, John M. McMurray, Claire V. Agarwal, Marian H. Jochem, Ramarkrishna Agarwal, Clark L. Gable, Sue Smith, Carol Gable, Audrey Vanderaar, William D. Harmon, Judy Mayer, George E. Mayer, Ph.D., Jan Fickter, Betty N. Monaghan, Edward L. Miller, Ruth Lewis, James L. Simpson, Kevin L. Scrivo, Ardeth D. Simpson, William B. Philips, Christine Scrivo, Vickie Philips, W. Bennett Lewis, Jill A. Brower, Louise H. Carmichael, Mary Anne Harmon, J.W. Carmichael, Jackson Brower, James P. Leslie, Jr., Rose Marie Leslie, Rebecca Harmon Schreiber, William Shades, Keith C. Shader, Ca-

thy Shader, Albert C. Broberg, Karen C. Broberg, together constituting the "True Church" of Peters Creek United Presbyterian Church, and on behalf of all other members of the congregation, Appellants

v.

Peters Creek United Presbyterian Church.

Commonwealth Court of Pennsylvania.

Argued April 17, 2013.
Decided April 30, 2014.

Stephen D. Marriner, Jr., Washington, for appellant Washington Presbytery of Pennsylvania.

Andrea Geraghty and Frank Kosir, Jr., Pittsburgh, for appellee Peters Creek United Presbyterian Church.

Marshall J. Tindall, Pittsburgh, for appellees Vicki Philips, James L. Simpson, Mary G. St. Clair, Harry R. Broberg, Ona D. Broberg, Janet DeGrange, Ronald A. DeGrange, John M. McMurray, Claire V. Agarwal, Marian H. Jochem, Ramarkrishna Agarwal, Clark L. Gable, Sue Smith, William D. Harmon, Judy Mayer, George E. Mayer, Jan Fickter, Betty N. Monaghan, Edward L. Miller, Ruth Lewis, Kevin L. Scrivo, Ardeth D. Simpson, William B. Philips, Christine Scrivo, W. Bennett Lewis, Jill A. Brower, Louise H. Carmichael, Mary Anne Harmon, J.W. Carmichael, Jackson Brower, James P. Leslie, Jr., Rose Marie Leslie, Rebecca Harmon Schreiber, William Shades, Keith C. Shader, Cathy Shader, Albert C. Broberg, Karen C. Broberg, Richard L. St. Clair and Audrey Vanderaar.

BEFORE: PELLEGRINI, President Judge, and McGINLEY, Judge, and LEADBETTER, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge.

OPINION BY President Judge PELLEGRINI.[1]

## I. *INTRODUCTION*

These consolidated cases involve a dispute over the control of a nonprofit corpo-

ration and church property, including the church building, land and personal property. Internecine battles of this kind have existed for hundreds of years in our jurisprudence. *See Baker v. Fales*, 16 Mass. 488 (1820) (resolving the Dedham Church property dispute). Such disputes are not unique in the Commonwealth and always entail much emotion and often sadness among the competing factions. The dispute here is between the majority of the members ("Majority") of the non-profit corporation named Peters Creek United Presbyterian Church ("Peters Creek Church") and a minority faction of the members of Peters Creek Church ("Minority") and the Washington Presbytery of Pennsylvania ("Washington Presbytery"), which is a presbytery of the Presbyterian Church (U.S.A.) ("PCUSA"). Over 40 members of the Minority are named individually as appellants.

On November 4, 2007, the Majority voted to disaffiliate Peters Creek Church from the Washington Presbytery and the PCUSA, to affiliate with the Evangelical Presbyterian Church ("EPC"), and to amend the corporate bylaws to replace all references to the PCUSA Constitution with references to the EPC Constitution. Before the corporation's vote, the Majority had filed, on May 9, 2007, an action against the Washington Presbytery in the Washington County Court of Common Pleas ("trial court") to quiet title to real property and for declaratory judgment regarding personal property (Civil Action No. 2007–2941). The Majority also sought a preliminary injunction to prevent the Washington

Presbytery from taking over the operation of the local congregation. The trial court entered the injunction, but it was later dissolved by agreement of the parties after their attempts at reconciliation had failed. The Washington Presbytery answered and brought counterclaims, seeking control of the property and alleging improper corporate acts. On August 29, 2008, the Minority filed a separate shareholder derivative action against the Majority (Civil Action No. 2008–7967). The two actions were later consolidated.[2]

The Washington Presbytery and the Minority (collectively, "Appellants") appeal from two orders of the trial court. In the first order, entered October 1, 2009, in case No. 2007–2941, the trial court resolved cross-motions for summary judgment regarding, *inter alia*, control of the property, ruling that Peters Creek Church did not hold its property in trust for the Washington Presbytery or the PCUSA. (Appeal docketed at No. 1044 C.D. 2011). In the second order, entered March 31, 2010, in case No. 2008–7967, the trial court resolved cross-motions for summary judgment regarding, *inter alia*, control of the non-profit corporation, ruling that the November 4, 2007 vote to disaffiliate was proper, and that control of Peters Creek Church is vested in the Majority and not in the Minority or the Washington Presbytery. (Appeal docketed at No. 1045 C.D. 2011).

■ Appellants filed their appeals in Superior Court, which transferred the cases to this Court by order of June 11,

---

1. The opinion was reassigned to the authoring judge on April 9, 2014.

2. Although the trial court found that the two cases were "factually identical," it denied the Minority's petition to join the first action, compelling the Minority to file a separate action. The actions were later consolidated by order of the President Judge of the Washington County Court of Common Pleas. (March 31, 2009 Trial Ct. Op. at 2, n. 2.)

2011.[3] There are three issues before us.[4] First, whether the trial court erred by not enforcing the Washington Presbytery's determination that the Minority and not the Majority was the "True Church." Second, whether the trial court erred by holding that Peters Creek Church property was not encumbered by a trust for the Washington Presbytery and the PCUSA. And third, whether the trial court erred by not nullifying the Majority's vote of November 4, 2007, to amend the corporate bylaws and disaffiliate from the Presbytery and the PCUSA.[5]

## II. *BACKGROUND*

Peters Creek Church was founded in the 1790s as a Presbyterian church. It was incorporated as a non-profit corporation in 1931 under the name "Peters Creek United Presbyterian Church of Peters Township, Washington County, Pennsylvania." (1931 Charter at 1, Reproduced Record (R.R.) at 15a). The charter states the purpose of the corporation is "the worship of Almighty God according to the faith, doctrine, discipline and usages of the United Presbyterian Church of North America." (*Id.*). At the time of incorporation, Peters Creek Church was affiliated with the "United Presbyterian Church in North America" ("UPCNA"), the predecessor of the PCUSA. In 1958, the UPCNA merged into the "United Presbyterian Church in the United States of America" ("UPCUSA"). In 1983, that entity merged to become what is currently named the PCUSA.[6] Peters Creek Church has been affiliated with the PCUSA since the PCUSA's creation in 1983, and has been affiliated since its incorporation in 1931 with the PCUSA's predecessors.

---

**3.** Pursuant to Section 762(a)(5)(ii) of the Judicial Code, 42 Pa.C.S. § 762(a)(5)(ii), "the Commonwealth Court shall have exclusive jurisdiction of appeals from final orders of the courts of common pleas in the following matters: ... all actions or proceedings ... involving the corporate affairs of any corporation not-for-profit subject to Title 15 or the affairs of the members, security holders, directors, officers or employees or agents thereof."

**4.** Our standard of review of the trial court's grant of summary judgment is *de novo* and the scope of review is plenary. *Pyeritz v. Commonwealth*, 613 Pa. 80, 88, 32 A.3d 687, 692 (2011).

**5.** Appellants filed separate briefs identifying the same three issues, although in a different order. Appellants also filed separate but identical reproduced records, referenced herein as "R.R."

**6.** The PCUSA is governed by a system of constituent bodies of ascending power: sessions, presbyteries, synods and the General Assembly of the PCUSA. *Southeastern Pennsylvania Synod of the Evangelical Lutheran Church in America v. Meena*, 19 A.3d 1191,

1196 n. 5 (Pa.Cmwlth.2011) (describing different types of church polity) (citing *Pilgrim Holiness Church v. Pilgrim Holiness Church of Athens Township*, 436 Pa. 239, 242, 259 A.2d 870, 872 n. 2 (1969)). Sessions govern an individual or "particular" church and consist of the pastor and elders of that church. Presbyteries, like the Washington Presbytery, are district governing bodies that govern a group of individual churches in a geographic area. The Washington Presbytery governs churches in Washington and Greene Counties. Synods govern geographic groups of presbyteries. The General Assembly governs the synods and is the highest governing body in the PCUSA. *See* PCUSA Constitution, Part II, Book of Order ("Book of Order") at G–9.0101 (describing form of government and governing bodies) (R.R. at 934a). The PCUSA and all of its constituent bodies are governed by the PCUSA Constitution, which consists of the Book of Confessions and the Book of Order. The Book of Order contains sections for the Form of Government, Directory for Worship and Rules of Discipline. Book of Order at G–1.0500 (describing Constitution); *Presbytery of Beaver–Butler of the United Presbyterian Church in the United States v. Middlesex Presbyterian Church*, 507 Pa. 255, 267, 489 A.2d 1317, 1323, *cert. denied*, 474 U.S. 887, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985) (same).

On June 3, 2001, Peters Creek Church voted to amend its bylaws (1) to become a "particular" congregation of the PCUSA, (2) to recognize that the provisions of the Constitution of the PCUSA are obligatory on Peters Creek Church and its members, and (3) to incorporate into its bylaws the mandatory provisions of the PCUSA Book of Order:

Article I, Name and Denominational Relationship

This church, incorporated under the laws of the Commonwealth of Pennsylvania, and known as the Peters Creek United Presbyterian Church, being a particular congregation of the Presbyterian Church (U.S.A.), **recognizes that the Constitution of said church is, in all its provisions, obligatory upon it and its members. Nothing in these bylaws shall prevail over the Constitution of said church nor the charter of this corporation. These bylaws shall be considered to include mandatory provisions and requirements on local churches set forth in the Book of Order of the [PCUSA] whether or not incorporated by specific reference.**

(June 3, 2001 Bylaws, Art. I, attached to Washington Presbytery's Preliminary Objections, Jan. 4, 2008) (emphasis added).[7]

Peters Creek Church also amended its bylaws to prohibit further amendments that were inconsistent with the PCUSA Constitution and Book of Order:

Article X, Amendments

These bylaws may be amended **subject to the provisions of the charter of this corporation, the laws of the Commonwealth of Pennsylvania, and the Constitution and Book of Order of the Presbyterian Church (U.S.A.),** at any meeting of the congregation or corporation called for that purpose, by a vote of not less than a majority of those present entitled to vote.

(*Id.*, Art. X) (emphasis added).

Since 1983, the Book of Order has contained the following express trust clause:

All property held by or for a particular church, a presbytery, a synod, the General Assembly, or the Presbyterian Church (U.S.A.), whether legal title is lodged in a corporation, a trustee or trustees, or an unincorporated association, and whether the property is used in programs of a particular church or of a more inclusive governing body or retained for the production of income, is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.).

Book of Order, G–8.0201 (the "Trust Clause") (R.R. at 932a). The Trust Clause was part of the Book of Order in 2001, when Peters Creek Church expressly adopted the Book of Order and made any future bylaw amendments subject to it.

The Book of Order also contained provisions, *inter alia*, (1) providing that a "particular" church must function under the provisions of the Constitution; (2) prohibiting a "particular" church from encumbering its property without the express permission of the presbytery; (3) prohibiting a "particular" church from disaffiliating from the PCUSA without the express permission of the presbytery; and (4) requiring a full vote of the PCUSA General Assembly in order to amend the Book of Order. Book of Order at G–7.0101, G–8.0501, G–8.0601 ("The relationship to the Presbyterian Church (U.S.A.) of a particu-

---

7. Peters Creek Church's commitment to be a "particular" church of the PCUSA is significant because the Book of Order sets forth specific provisions for "particular" churches, including that "[e]ach particular church of the Presbyterian Church (U.S.A.) shall be governed by this Constitution." Book of Order at G–4.0104 (R.R. at 912a).

lar church can be severed only by constitutional action on the part of the presbytery."), and G–18.0301 (R.R. at 927a, 933a, 1012a–13a).

■ The parties do not dispute the contents of the Book of Order or that the bylaw amendments of June 3, 2001, were binding on the corporation at the time they were made.[8] They do, however, dispute the meaning of the language and its impact on the corporation. The interpretation of written documents and contracts is subject to our plenary review.

## III. NEUTRAL PRINCIPLES OF LAW

■ The issues raised by Appellants on appeal necessitate a review of the deference and neutral principles of law approaches to church property disputes. A long line of cases instructs that civil courts may not decide purely religious matters. *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979); *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church (Hull)*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in North America*, 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952); *Watson v. Jones*, 80 U.S. 679, 13 Wall. 679, 20 L.Ed. 666 (1872); *In re Church of St. James the Less*, 585 Pa. 428, 888 A.2d 795 (2005); *Presbytery of Beaver–Butler of the United Presbyterian Church in the United States v. Middlesex Presbyterian Church*, 507 Pa. 255, 489 A.2d 1317, *cert. denied*, 474 U.S. 887, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985). The Establishment Clause of the First Amendment of the United States Constitution commands that government, including the courts, "shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." U.S. Const., Amend. I; *Serbian Eastern Orthodox Diocese for United States and Canada v. Milivojevich*, 426 U.S. 696, 710, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976) (explaining that "government" includes courts). "[T]he First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes." *Jones*, 443 U.S. at 602, 99 S.Ct. 3020. "Most importantly, the First Amendment prohibits civil courts from resolving church property disputes on the basis of religious doctrine and practice." *Id.* These principles apply equally to issues of church polity and church administration. *Milivojevich*, 426 U.S. at 710, 96 S.Ct. 2372.

The principles limiting the role of civil courts in the resolution of religious controversies were first recognized by the United States Supreme Court over 140 years ago:

> In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect.

*Watson*, 80 U.S. at 728.

■■ The principles laid down in *Watson* have come to be known as the "deference rule," which instructs that the right to freely practice religion encompasses a right to form religious associations and establish a system of governance therefore. *Kedroff*, 344 U.S. at 115, 73 S.Ct.

---

8. The Majority averred in its answer to Washington Presbytery's New Matter that "It is admitted that Exhibit 'C' is a copy of the Bylaws of Peters Creek Church in effect beginning June 3, 2001." (R.R. at 83a, 208a). The Majority argues that Peters Creek Church is not bound by those bylaws because, simply, they were amended on November 4, 2007.

143. It is well established that in order not to intrude upon constitutionally-protected religious autonomy, courts generally must defer to church hierarchy in the resolution of any ecclesiastical matter:

> [W]henever the questions of discipline, or of faith, or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them in their application to the case before them.

*Watson,* 80 U.S. at 727. *See also Jones,* 443 U.S. at 603, 99 S.Ct. 3020 ("As a corollary to this commandment, the Amendment requires that civil courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization.").

▮ The Court would later build on the deference rule, holding that "[i]t is of course true that the State has a legitimate interest in resolving property disputes, and that a civil court is a proper forum for that resolution." *Hull,* 393 U.S. at 445, 89 S.Ct. 601. Although "the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes.... [I]t is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment." *Id.* at 449, 89 S.Ct. 601.

Applying the commands of the First Amendment to the resolution of church property disputes in civil courts, the Court held that states may alternatively resolve such disputes by the "neutral principles of law approach":

> Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property

disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes ...; the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.

*Id.* at 449, 89 S.Ct. 601 (citations omitted). The Court would later extoll "[t]he primary advantages" of the neutral-principles approach: "it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Jones,* 443 U.S. at 603, 99 S.Ct. 3020.

The Pennsylvania Supreme Court adopted the "neutral principles of law" approach, recognizing that the deference approach still applied to ecclesiastical issues. *Beaver–Butler,* 507 Pa. at 263–64, 489 A.2d

at 1321–22. In adopting the neutral principles approach, the Court first recognized the religious freedom guaranteed by the First Amendment to the United States Constitution:

> [T]he right to practice one's belief and worship as one chooses is so deep a root of our constitutional culture that a court, even one with the best intentions, can be no more than a clumsy intruder into the most delicate and sensitive areas of human life. . . . The view of a court as to who are heretics among warring sects is worth nothing, and must count as nothing if our cherished diversity of religious views is to prevail.

*Beaver–Butler*, 507 Pa. at 260, 489 A.2d at 1321.

Our Supreme Court next recognized that "[a]ll disputes among members of a congregation, however, are not doctrinal disputes. Some are simply disputes as to the meaning of agreements on wills, trusts, contracts and property ownership. These disputes are questions of civil law and are not predicated on any religious doctrine. While it is true that parties may agree to settle their disputes according to their own agreed fashion, the question of what they agreed to, or whether they agreed at all, are not doctrinal and can be solved without intruding into the sacred precincts. From this consideration has evolved what is called the 'neutral principles approach'. . . ." *Beaver–Butler*, 507 Pa. at 261–62, 489 A.2d at 1320–21. This approach limits the court "to determine the underlying issue by utilizing purely legal principles without delving into ecclesiastical matters." *Meena*, 19 A.3d at 1196.

## IV. THE "TRUE CHURCH" ISSUE

Appellants seek a declaration from this Court that the Minority of Peters Creek Church is the "True Church" of the PCU-SA. Appellants argue that the trial court erred when it refused to defer to the Washington Presbytery's ecclesiastical decision that the Minority of Peters Creek Church is the "True Church" of the PCU-SA. Appellants also argue that resolution of the "True Church" issue subsumes the issue of who controls church property, because the Book of Order provides that only the "True Church" can control the property of its member churches. (Minority Br. at 41; Washington Presbytery Br. at 30.) Appellants' argument is rooted in the following provision of the Book of Order:

> The relationship to the Presbyterian Church (U.S.A.) of a particular church can be severed only by constitutional action on the part of the presbytery. (G–11.0103i) If there is a schism within the membership of a particular church and the presbytery is unable to effect a reconciliation or a division into separate churches within the Presbyterian Church (U.S.A.), **the presbytery shall determine if one of the factions is entitled to the property because it is identified by the presbytery as the "True Church" within the Presbyterian Church (U.S.A.).** This determination does not depend upon which faction received the majority vote within the particular church at the time of the schism.

Book of Order at G–8.0601 (R.R. at 933a) (emphasis added).

The Majority counters that "the only matter at issue is a determination of whether Peters Creek Church complied with [Pennsylvania law] in voting to disaffiliate from the PC(USA), to amend its bylaws to remove all references to the PC(USA), and to affiliate with the Evangelical Presbyterian Church." (Majority Br. at 7.)

▊ Applying the principles of deference and neutrality set forth by the United States Supreme Court and adopted by the Pennsylvania Supreme Court, it is clear that we have no authority to determine who among the parties is the "True Church." *See, e.g., Kedroff,* 344 U.S. at 107–08, 73 S.Ct. 143 (declaring unconstitutional a New York law intended to transfer control of Russian Orthodox churches in New York from the Patriarch of Moscow, the central governing hierarchy of the Russian Orthodox Church, to the governing authorities of the Russian Church in America); *Gonzalez v. Archbishop,* 280 U.S. 1, 16, 50 S.Ct. 5, 74 L.Ed. 131 (1929) (deferring to a church on whether an individual was qualified for an appointment to a chaplaincy in the Roman Catholic Church because it is a purely ecclesiastical matter); *Meena,* 19 A.3d at 1198 (deferring to a church on whether the local congregation could continue to fulfill its mandate to the national denomination); *In re Greek Orthodox Kathedrikos of St. George,* 26 Fiduc.Rep.2d 414 (Phila.Com.Pl.2005), *aff'd,* 895 A.2d 701 (Pa.Cmwlth.), *appeal denied,* 588 Pa. 771, 905 A.2d 501 (2006) (holding that a court lacked subject matter jurisdiction to review a petition to set aside corporate actions removing officers from elected leadership positions within a religious organization); *see also Presbytery of Donegal v. Wheatley,* 99 Pa.Cmwlth. 312, 513 A.2d 538, 539–40 (1986) ("It is improper for a trial court to determine whether a religious group adheres to, or has departed from, a particular doctrine or belief. Such a determination follows the 'departure from doctrine' rule of judicial review expressly rejected in *Watson v. Jones,* and found unconstitutional in *Kedroff v. St. Nicholas Cathedral.*").

▊ Appellants are correct that in the event of a schism, the Book of Order permits the Washington Presbytery to make the ecclesiastical determination of which of the two factions of Peters Creek Church is the "'True Church' within the [PCUSA]," Book of Order at G–8.0601 (R.R. at 933a), and that Pennsylvania courts must defer to that religious determination to the extent it has been rendered by the "the highest court" of the PCUSA. *Jones,* 443 U.S. at 603, 99 S.Ct. 3020. However, Appellants are incorrect that their religious determination necessarily controls our holding on the remaining issues. The ecclesiastical determination of who is and who is not the "True Church" does not control the fate of Peters Creek Church's property, nor does it control whether the Majority vote of November 4, 2007, was proper. Those issues must be decided under civil law. *Beaver-Butler,* 507 Pa. at 262, 489 A.2d at 1321 (holding that disputes concerning ownership and control of church property "are questions of civil law and are not predicated on any religious doctrine").[9]

9. Appellants also argue that the "True Church" determination is nothing more than the outcome of an alternative dispute resolution system sanctioned by Pennsylvania law and expressly agreed to by Peters Creek Church. Again, Appellants are correct only insofar as that dispute resolution system, applying ecclesiastical law, does not determine property rights, which must be determined by a court of law applying the civil law of Pennsylvania. The language of the "True Church" provision of the Book of Order, *i.e.,* that "the presbytery shall determine if one of the factions is entitled to the property because it is identified by the presbytery as the 'True Church' within the Presbyterian Church (U.S.A.)," is insufficient under Pennsylvania law to create a trust in favor of the PCUSA or to otherwise alter the property rights of Peters Creek Church. As a result, the outcome of the PCUSA's "True Church" determination does not provide a preemptive resolution of the property dispute.

## V. *THE CHURCH PROPERTY*

While we may not rule on who among the parties is the "True Church," we may examine the charter, the bylaws, the Book of Order and the corporation's conduct to determine, under Pennsylvania law, the questions of whether Peters Creek Church holds its property in trust for the Washington Presbytery and whether the corporation's vote of November 4, 2007, was proper. *Beaver–Butler*, 507 Pa. at 266, 489 A.2d at 1323 (noting that the determination of church property rights under civil law "should in no way be considered as a resolution of any competing doctrinal issues" and that it involves the "meaning of agreements on wills, trusts, contracts, and property ownership"). *See also Jones*, 443 U.S. at 604, 99 S.Ct. 3020 (explaining that courts may examine documents like deeds, corporate charters and the constitution of the national denomination to determine church property rights).

Appellants make the threshold argument that the United States Supreme Court has expressly stated that religious denominations, in order to ensure continued control of their member churches' property in the event of a dispute, need only incorporate a trust clause into their governing documents before a dispute arises. (Minority Br. at 22; Washington Presbytery Br. at 46 ("The dispositive question . . . is whether express trust language was found in the governing documents of the denominational church.")). Appellants' assertion is based on the following excerpt from *Jones*, 443 U.S. at 606, 99 S.Ct. 3020:

> At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. **Alternatively, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal.** And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form. (Emphasis added).

Appellants contend that, with the quoted passage, the Court obviated a duty to acquire "written consent from individual churches" that would need to be "tailored to individual trust laws in each of the 50 states." (Minority Br. at 23). To hold otherwise, they argue, would violate the Supreme Court's instruction that the burden on national denominations to "ensure" retention of church property be "minimal." In short, Appellants contend that the Supreme Court created a unilateral trust doctrine for religious denominations.

■■■■ We disagree. First, Pennsylvania courts have rejected Appellants' application of *Jones* and, instead, have repeatedly ruled that the beneficiary of a trust, religious or otherwise, may not unilaterally declare a trust. *Beaver–Butler*, 507 Pa. at 268–69, 489 A.2d at 1324 (examining the intent of local church, *i.e.*, of the settlor, not of the denomination); *St. James the Less*, 585 Pa. at 451, 888 A.2d at 810 (same); Restatement (Second) of Trusts § 2 ("A trust . . . arises as a result of a manifestation of an intention to create it."); Restatement (Second) of Trusts § 18 cmt. a ("[O]ne who has no interest in a piece of land cannot effectively declare himself trustee of the land."). Thus, whereas the Supreme Court recognized in *Jones* that a denomination may require its members to hold property in trust for it, and that such requirement may be written into the denomination's constitution or other governing document, the denomination

may not unilaterally impose the requirement on its members without the members' consent.

■ Second, Appellants have misread the holding in *Jones*. In describing the alternative approaches that a denomination may use to ensure that factions loyal to it will retain church property, the Court explained that "an express trust in favor of the denominational church" could be used to bind civil courts "to give effect to the result indicated by **the parties,** provided it is embodied in **some legally cognizable form.**" *Id.* at 606, 99 S.Ct. 3020 (emphasis added). At a bare minimum, this suggests that the trust in favor of the denomination must reflect the intent of both parties, the local church and the denomination, and it must be cognizable in a form already recognized by the law, and not contrary to it. Contrary to Appellants' contention, we do not believe that the United States Supreme Court intended in 1979 to nullify standard principles of trust law that have stood for hundreds of years. The neutral principles approach works because lawyers and judges may rely on well-established concepts of trust and property law, not special rules created for religious property disputes. *See Jones,* 443 U.S. at 603, 99 S.Ct. 3020 (explaining that "[n]eutral principles of law" are those "objective, well-established concepts of trust and property law familiar to lawyers and judges.").

Third, Appellants' misconstruction violates the Establishment Clause and would effectively divest legal property owners of their land against their will. Religious denominations would be given a free pass to declare themselves beneficial owners of local church properties, taking the titled landowner's property when churches withdraw from the denomination. A "church only" form of trust formation would violate the neutrality required by the United States and the Pennsylvania Constitutions.[10] *See Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ("[The] First Amendment mandates governmental neutrality between religion and religion, and between religion and non-religion.").

In sum, Pennsylvania law contains certain requirements for the creation of a trust, and those requirements are not loosened to accommodate or establish religious organizations. For these reasons, we refuse Appellants' invitation to follow the holdings from Georgia, New York and California, where the highest courts in those states have ruled that a national denomination may create a trust by unilaterally including language in a constitution without the express intent of the local churches. *See Presbytery of Greater Atlanta, Inc. v. Timberridge Presbyterian Church,* 290 Ga. 272, 277–82, 719 S.E.2d 446, 451–54 (2011) (finding a trust in favor of PCUSA while expressly acknowledging that the trust did not meet the requirements of Georgia statutory law), *cert. denied,* 567 U.S. ——, 132 S.Ct. 2772, 183 L.Ed.2d 638 (2012); *Presbytery of Hudson River Presbyterian Church (U.S.A.) v. Trustees of First Presbyterian Church & Congregation of Ridgeberry,* 72 A.D.3d 78, 95–97, 895 N.Y.S.2d 417, 428–30 (2010) (finding that the Trust Clause in Book of Order, in addition to local congregation's

---

10. Article 1, Section 3 of the Pennsylvania Constitution provides: "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship." Pa. Const. art. 1, § 3.

attendance at General Assembly meetings when the Trust Clause was proposed and adopted, was sufficient to establish a trust in favor of PCUSA); *In re Episcopal Church Cases,* 45 Cal.4th 467, 487–89, 87 Cal.Rptr.3d 275, 198 P.3d 66, 80–81 (2009) (finding "superior religious body or general church" may unilaterally create trusts in its favor over property held by member churches due to a statutory amendment by the state legislature permitting it). Accordingly, we now consider Pennsylvania trust law.

"In order for a court to find that a trust has been created, there must exist in the record clear and unambiguous language or conduct evidencing the intent to create a trust. No particular form of words or conduct is required to manifest the intention to create a trust. Such manifestation of intention may be written or spoken words or conduct indicating that settlor intended to create a trust." *Beaver–Butler,* 507 Pa. at 268–69, 489 A.2d at 1324–25 (quoting *Bair v. Snyder County State Bank,* 314 Pa. 85, 89, 171 A. 274, 275 (1934)). "It is not necessary that the terms 'trust' and 'trustee' should be used. The donor need not say in so many words, 'I declare myself trustee,' but he must do something which is equivalent to it, and use expressions which have that meaning." *In re Smith's Estate,* 144 Pa. 428, 435–36, 22 A. 916, 917 (1891). *See also In re Thompson's Estate,* 416 Pa. 249, 206 A.2d 21 (1965) (following *In re Smith's Estate* ); *St. James the Less,* 585 Pa. at 450, 888 A.2d at 809 (explaining that no form of terminology is necessary to create a trust, nor is the absence of the word "trust" controlling).

Nevertheless, lack of formality does not obviate the necessity for the appearance of all the elements of a completed trust. *Beaver–Butler,* 507 Pa. at 268–69, 489 A.2d at 1324–25 (quoting *Bair,* 314

Pa. at 89, 171 A. at 275). Every trust symptom must be present, regardless of informality surrounding the inception of the relationship. A trust cannot arise from loose statements admitting possible inferences consistent with other relationships, like a lease or a license. *Id.* In conducting this inquiry, the primary focus must be on the intent of the settlor at the time of the creation of the alleged trust. *Id.* (citing Restatement (Second) of Trusts § 23). *See also St. James the Less,* 585 Pa. at 446, 888 A.2d at 806 ("[A]ccording to well-established legal principles governing trusts, courts may only find a trust exists where there is clear and unambiguous language or conduct indicating that the settlor intended to create a trust.") (citing cases). The intent of the settlor at the time of the creation of a trust may be shown by facts that occur after that time. *Matter of Krebs,* 334 Pa.Super. 635, 483 A.2d 919, 921 n. 1 (1984); Restatement (Second) of Trusts § 4.

Here, Appellants argue that the corporate bylaw amendments of June 3, 2001, are clear and unequivocal that Peters Creek Church intended to hold its property in trust for the PCUSA. The Majority counters that the trial court properly determined that Appellants proffered no evidence of Peters Creek Church's intent to hold the Peters Creek Church property in trust for the PCUSA. We agree with Appellants and reverse the trial court on this issue.

The bylaw provision in question, quoted above in its entirety, provides that the PCUSA Constitution, which includes the Book of Order, is "obligatory" on the church's members, that "nothing in these bylaws shall prevail over the Constitution," and that the bylaws "shall be considered to include the mandatory provisions and requirements on local churches set forth in the Book of Order of the Presbyterian

Church (U.S.A.), whether or not incorporated by specific reference." (June 3, 2001, Bylaws, Art. I). This express, written language is clear and unambiguous evidence of Peters Creek Church's intent to be bound by the PCUSA Book of Order, including the provision that member churches hold their property in trust for the PCUSA. There is no dispute that Article I of the bylaws was appropriately adopted by and was binding on the nonprofit corporation in 2001. The Book of Order contained the Trust Clause at that time: "All property held by or for a particular church ... is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.)." Book of Order at G–8.0201 (R.R. at 932a).[11]

Peters Creek Church further amended its bylaws to expressly state that it was a "particular congregation of the [PCUSA]," further acknowledging that it accepted all of the duties and benefits of being a "particular" church of the PCUSA. In addition, becoming a "particular" church of the PCUSA obligated Peters Creek Church to the Trust Clause and other provisions, including, *inter alia,* provisions (1) requiring a "particular" church to function under the provisions of the Constitution; (2) prohibiting a "particular" church from encumbering its property without the express permission of the Presbytery, (3) prohibiting a "particular" church from disaffiliating from the PCUSA without the express permission of the Presbytery, and (4) requiring a full vote of the PCUSA General Assembly in order to amend the Book of Order. Book of Order at G–7.0101, G–8.0501, G–8.0601, and G–18.0301 (R.R. at 927a, 933a, 1012a–13a).[12]

■ Peters Creek Church's conduct following its accession in 2001 to the Book of Order is further evidence of its intent to create a trust. *See St. James the Less,* 585 Pa. at 446, 888 A.2d at 806 (examining language and conduct of local church to determine intent to create a trust); *Matter of Krebs,* 483 A.2d at 921 n. 1 (holding that the intent of the settlor at the time of the creation of a trust may be shown by facts that occur after that time); Restatement (Second) of Trusts § 4 (1959) (same). In 2005, Peters Creek Church sought and received permission from the Presbytery to purchase 6.4 acres of property for $405,000 and to sell a separate parcel for $50,000. (Minority's Mot. for Summ. J., Nov. 9, 2009, at Ex. A). (*See also* Majority Br. No. 1044 at 21–22 (acknowledging actions)). These acts, standing alone, are insufficient to indicate clear and unequivocal intent to create a trust. *See Presbytery of Donegal v. Calhoun,* 99 Pa.Cmwlth. 300, 513 A.2d 531, 535 (1986) (holding that a provision prohibiting a church from encumbering its property, without more,

11. Peters Creek Church obligated its members to the entirety of the PCUSA Constitution and specifically acceded to the "mandatory" provisions, which includes the Trust Clause. The Preface to the Constitution and the Book of Order states that use of the verbs "SHALL and IS TO BE/ARE TO BE signify practice that is mandated." In contrast, use of the verbs "SHOULD," "IS APPROPRIATE," or "MAY," signify practice that is "strongly recommended," "commended as suitable," or "permissible but not required," respectively. The Trust Clause uses the affirmative verb "is held in trust" rather than "should" or "may be held in trust," making this provision mandatory.

12. In addition to the Trust Clause, the Book of Order provides that "Wherever property of ... a particular church of the [PCUSA] ceases to be used by that church as a particular church of the [PCUSA] in accordance with this Constitution, such property shall be held, used, applied, transferred, or sold as provided by the presbytery." Book of Order at G–8.0300.

does not create a trust).[13] However, when viewed alongside the prior written documentation, these acts are further evidence that Peters Creek Church considered itself the trustee of property held for the benefit of the Washington Presbytery.[14] Our Supreme Court noted that similar facts, coupled with an express adoption of the canons of the national denomination, were sufficient to find the creation of a trust in *St. James the Less*, 585 Pa. at 433, 888 A.2d at 798 (noting that church charter incorporated and agreed to be bound by Book of Discipline and church sought permission from denomination to obtain mortgages on property). None of these or similar facts was present in *Beaver–Butler*, where the Court ruled in favor of the local church seeking to disaffiliate with its property.[15]

In holding that there is no trust here, the trial court found that "to create a trust, Peters Creek Church must have, at some time after becoming affiliated with the national church, manifested an intent to create a trust by signing a trust document." (Oct. 1, 2009, Trial Ct. Op. at 22.) Accordingly, the court found that "there is no specific evidence within the record to show that at the time the PCUSA merged with the UPCUSA [in 1983], thereby affiliating Peters Creek Church with the PCUSA, that Peters Creek Church intended to place their property in trust for the benefit of the PCUSA." (*Id.* at 23.) The court also ruled that "the Book of Order in the present case is not a signed writing" (*id.* at 22, n. 22) and that Peters Creek Church's 2001 bylaw amendments merely indicated the church's intent to join the PCUSA, and not to be bound by the provisions of the Book of Order, and "simply joining the PCUSA is clearly insufficient under Pennsylvania trust law to create a trust." (*id.* at 26).

■■■ The trial court erred in several respects. First, Section 7732(a)(2) of the Pennsylvania Uniform Trust Act (PAUTA), 20 Pa.C.S. § 7732(a)(2), requires a

---

**13.** Peters Creek Church also sought permission from the Presbytery to encumber its property with mortgages in 1962 and 1974 when it submitted architectural plans and mortgage documents to the Presbytery for approval. (Minority's Mot. for Summ. J., Nov. 9, 2009, at Ex. A.) Appellants contend this and other evidence indicate that Peters Creek Church has always held its property in trust for the PCUSA and its predecessors. The Majority counters that it has never been the policy of any Presbyterian denomination, before 1983, to require its member churches to hold their property in trust. Appellants' argument is incorrect—without the 2001 bylaw amendments, the act of asking permission from the Washington Presbytery to perform certain tasks is not sufficient to create a trust. The Majority's argument, in addition to being unsupported by citations to the record, is irrelevant.

**14.** The trial court erred when it found that there was "no evidence" that Peters Creek Church sought permission from the Presbytery before encumbering the corporation's property with a mortgage, as required by the Book of Order. (July 23, 2010, Trial Ct. Op. at 8.) Regardless of the legal import of such evidence, the evidence is clearly part of the record and the trial court erroneously ignored it.

**15.** In 2004, Peters Creek Church's Reverend L. Rus Howard sought to amend the PCUSA Book of Order by removing the Trust Clause. (Washington Presbytery Meeting Minutes, Minority's Mot. for Summ. J., Nov. 9, 2009, at Ex. A.) He followed the steps prescribed in the Constitution and presented an Overture to the Washington Presbytery, asking the Presbytery to present an Overture at the 2006 meeting of the General Assembly. Rev. Howard's Overture proposed revising the Trust Clause to state that: "all property held by or for a particular church ... is the property of the particular entity in which it is titled." The Overture was defeated by the member churches in the Washington Presbytery by a vote of 50–19 in May 2005, and it was not presented to the General Assembly.

trust to be evidenced by a signed writing. However, it does not require a formal, signed trust instrument. Our law is clear that the settlor's intent does not hinge on the form of the writing or the use of the specific words "trust" or "trustee." *Beaver–Butler*, 507 Pa. at 268–69, 489 A.2d at 1324–25; *Smith's Estate*, 144 Pa. at 435–36, 22 A. at 917; *Conference of African Union First Colored Methodist Protestant Church v. Shell*, 659 A.2d 77, 80 (Pa. Cmwlth.), *appeal denied*, 542 Pa. 676, 668 A.2d 1138 (1995) ("*Middlesex* does not stand for the proposition that the intent to create a trust must be manifested by express language of an instrument. In the case *sub judice*, however, there is express documentary evidence demonstrating [the local church]'s acceptance of the denomination's rules governing the use and disposition of real property."). It is the settlor's intent derived from the writing that controls.

█ Second, whether the Book of Order is a writing signed by Peters Creek Church, whether Peters Creek Church intended to place its property in trust for the benefit of the PCUSA **in 1983** (which the trial court found was the time the PCUSA merged with the UPCUSA, thereby affiliating Peters Creek Church with the PCUSA), and whether the Book of Order contained a trust clause **in 1983** are irrelevant to the issues here. A corporation acts through its officers, shareholders or members; thus, the signed writing in question is the corporation's bylaws, which were drafted and approved by a vote of the corporation's members. The plain language of the 2001 bylaws—which all parties agree were binding on Peters Creek

Church at least until their amendment in 2007—constitutes significantly more than Peters Creek Church's "simply joining the PCUSA." Peters Creek Church's admitted words and acts have meaning and it is bound by that meaning.

The undisputed facts are that the PCUSA added the Trust Clause to the Book of Order in 1983. Peters Creek Church took part in the PCUSA Generally Assembly proceedings where the clause was proposed and adopted by PCUSA member churches, but did not take any specific action until 2001 to incorporate the clause into its own bylaws. "[S]imply joining the PCUSA," even after the Trust Clause was added, is likely insufficient under Pennsylvania law to create a trust. *Calhoun*, 513 A.2d at 535 (holding that a statement in corporate charter to "worship" in accordance with the beliefs of a national denomination is insufficient to indicate intent to create a trust in favor of the denomination). However, those are not the facts before us. In 2001, Peters Creek Church took the significant, extra steps, beyond simply joining the PCUSA, to incorporate the PCUSA's governing documents into its governing documents and to expressly agree to be bound by them. The trial court's holding, and the Majority's argument, that the PCUSA is seeking to unilaterally impose a trust on Peters Creek Church's property (which may have been true between 1983 and 2001) prior to Peters Creek Church's significant, extra steps, is not supported by the facts.[16]

█ The Majority stresses that title to Peters Creek Church property never changed hands and its deeds were never amended.[17] Under Pennsylvania law, no

---

**16.** Importantly, there is no allegation or argument that Peters Creek Church was unaware of the Trust Clause or that it was furtively inserted into the Book of Order after 2001, or that Peters Creek Church's decision to accede

to the provisions of the Book of Order was anything other than a decision made by its members of their own free will.

**17.** Deeds date to 1809 and show that the properties have been titled in some form of

transfer or amendment of title or deed is necessary to create a trust. In *St. James the Less,* 585 Pa. at 452, 888 A.2d at 810, our Supreme Court held that the local church had created a trust in favor of the Episcopal diocese, but reversed this Court's decision to change title to the property to effect that result, instead ordering that the local church was to retain legal title to its property and its members were required to act as trustees for the diocese. It is the very nature of a trust that the trustee, here, the non-profit corporation Peters Creek Church, will retain title to the subject property. *Id.; Petition of Acchione,* 425 Pa. 23, 29–30, 227 A.2d 816, 820 (1967) ("That the municipality in this case would be both the settlor and the trustee of the trust presents no obstacle to the creation of a trust."); *In re Smith's Estate,* 144 Pa. at 435, 22 A. at 917 ("[W]here the donor makes himself the trustee, no transfer of the subject-matter is necessary.... In such cases no assignment of the legal title is required, for the nature and effect of the transaction is that the legal title remains in the donor for the benefit of the donee."); Restatement (Second) of Trusts § 17 ("A trust may be created by (a) a declaration by the owner of property that he holds as trustee for another person."); Restatement (Second) of Trusts § 100 ("The settlor of a trust can be a trustee of the trust."); 20 Pa.C.S. § 7731 cmt. ("A trust created by self-declaration is best created by reregistering each of the assets that comprise the trust into the settlor's name as trustee. However, such registration is not necessary to create a trust.").

Our holding today follows the analysis used in our Supreme Court's and this Court's prior holdings on church property disputes. In *Beaver–Butler,* the Supreme Court found that no trust existed and ruled in favor of a local Presbyterian church, Middlesex, that sought to disaffiliate from the PCUSA's predecessor, the UPCUSA. At the time Middlesex had affiliated with the UPCUSA, there was no trust clause in the national denomination's governing documents. *Beaver–Butler,* 507 Pa. at 266–67, 489 A.2d at 1323–24 (discussing facts). Middlesex disaffiliated effective April 18, 1981. *Id.* The separation was effected by a corporate charter amendment. *Id.* The Court found that the national denomination amended the Book of Order to include an express trust clause on May 23, 1981, **one month after Middlesex had disaffiliated.** *Id.* The amendment to the Book of Order was proposed in 1979, was initially rejected by the member churches, and was finally adopted by the member churches **after** Middlesex had disaffiliated. *Id.* At the time Middlesex disaffiliated, the national denomination's constitution did not prevent a member from unilaterally disaffiliating. *Id.* Accordingly, the Court held that Middlesex was not bound by the Trust Clause. *Beaver–Butler,* 507 Pa. at 269, 489 A.2d at 1325. *See also Calhoun,* 513 A.2d at 533 (noting that when the Trust Clause was added to the Book of Order, the local church rejected it rather than accede to it, and disaffiliated from the UPCUSA, as there was no provision at the time preventing local churches from disaffiliating).

The facts here are strikingly different from the facts of *Beaver–Butler.* Since the holdings in *Beaver–Butler* and *Calhoun,* the PCUSA, as ratified by its member churches, added to the Book of Order an express trust clause. The PCUSA also

the name Peters Creek Church: the 1809 deed names "Trustees of the Associate Congregation of Peters Creek Church;" deeds of 1873, 1894, 1897 and 1921 name "Trustees of the United Presbyterian Church of Peters Creek;" and deeds of 1955, 1981 and 2005 name "Peters Creek United Presbyterian Church."

added express provisions regarding disaffiliation—only the Presbytery governing a local church, not the local church itself, may approve disaffiliation. These provisions were part of the Book of Order in 2001 when Peters Creek Church agreed to "include" them in its bylaws and to be bound by them. Applying the analysis in *Beaver–Butler* to the facts here supports a finding that Peters Creek Church intended to commit its property to a trust in favor of the PCUSA.

In this regard, our holding here is on all fours with *Shell,* where the denomination's Book of Discipline contained an unequivocal trust clause, similar to the clause now present in the PCUSA Book of Order. *Shell,* 659 A.2d at 78. The local church expressly adopted the Book of Discipline in its articles of incorporation. *Id.* We found that "there is express documentary evidence demonstrating [the local church]'s acceptance of the denomination's rules governing the use and disposition of real property" and ruled that the local church's adoption of the Book of Discipline, which contained the trust clause at the time of adoption, was clear, unequivocal, trust-creating evidence binding on the local church. *Id.* at 80. Similarly, in *St. James the Less,* our Supreme Court examined the words of the local church's governing documents and its conduct over a period of years, and found that it intended to be bound by an express trust clause (the Dennis Canon) contained in the denomination's governing canons. *Id.,* 585 Pa. at 446, 888 A.2d at 806.

Finally, the Majority cites provisions of the PAUTA for the proposition that the only method to create a valid trust under Pennsylvania is through a signed trust instrument. This is incorrect and the trial court erred to the extent it based its decision on this rationale.

On November 6, 2006, the PAUTA became effective and Pennsylvania officially adopted the Uniform Trust Code (UTC) with certain express changes not applicable here. The PAUTA was intended to supplement, not repeal, existing common law, except where specifically provided in the statute. *See* 20 Pa.C.S. § 7706 ("The common law of trusts and principles of equity supplement this chapter, except to the extent modified by this chapter."); *id.,* cmt. ("To determine the common law and principles of equity in a particular state, a court should look first to prior case law in the state. . . .").

The PAUTA, the legislative history and the comments from the April 2005 Joint State Government Commission's Report of the Advisory Committee on Decedent's Estates Laws (the body that edited the UTC and proposed its adoption in Pennsylvania), expressly provide that enactment of the PAUTA was not intended to upset existing common law. *Id.,* Jt. St. Govt. Comm. Cmt., prefatory cmt. (stating that the Committee's comments may be "used in determining the intent of the General Assembly"); *Estate of Stephano,* 602 Pa. 527, 536, 981 A.2d 138, 143 (2009) (Baer, J., concurring) (noting that the General Assembly intended to clarify law surrounding trusts and to make Pennsylvania probate law more uniform with other states, "while simultaneously preserving our vast body of common law precedent.") Where the General Assembly intended specific provisions of the PAUTA to repeal existing common law, it stated so expressly. *See, e.g.,* 20 Pa.C.S. § 7768, Jt. St. Govt. Comm. Cmt. (stating that this section repeals the contrary rule of common law, citing the specific holding of the Pennsylvania Supreme Court). There is no indication that the General Assembly intended the PAUTA to create new requirements

for the creation of an express trust that would supplant preexisting law.[18]

In any event, the elements for the creation of a trust set forth in the PAUTA have been met here. Section 7731, regarding the creation of a trust, provides that "a trust may be created by: ... (2) written declaration, signed by or on behalf and at the direction of the owner of property as required by section 7732 (relating to requirements for creation—UTC 402), that the owner holds identifiable property as trustee." 20 Pa.C.S. § 7731. Section 7732 provides "(a) Requirements.—A trust is created only if: (1) the settlor has the capacity to create a trust; (2) the settlor signs a writing that indicates an intention to create the trust and contains provisions of the trust; (3) the trust has a definite beneficiary or is: (i) a charitable trust; ... (4) the trustee has duties to perform; and (5) the same person is not the sole trustee and sole beneficiary of the trust." 20 Pa.C.S. § 7732. The comments to Section 7732 state simply that this Section "codifies the basic requirements for the creation of a trust. To create a valid trust, the settlor must indicate an intention to create a trust." 20 Pa.C.S. § 7732 cmt. (citing Restatement (Third) of Trusts § 13; Restatement (Second) of Trusts § 23 (1959)). Therefore, the crux of the determination remains whether the settlor indicated an intention in a signed writing to create a trust. As discussed above, the

evidence here clearly and unequivocally shows that the settlor, Peters Creek Church, did so intend.[19]

In addition, we are not left to guess regarding the meaning or context of the trust clause. It clearly states: "All property held by or for a particular church ... is held in trust nevertheless for the use and benefit of the Presbyterian Church (U.S.A.)." The mandate that "all property" is "held in trust for the use and benefit of the [PCUSA]" is unambiguous and subject to only one meaning and is not impermissibly vague.

Further, the trust adequately identifies the *res,* the beneficiary and the duty of the trustees to hold their property "for the use and benefit" of the beneficiary. We and our Supreme Court have previously found similar language to be sufficient to create a trust. *St. James the Less; Shell.* That the duties of the trustee or the "specific terms" of the trust are not more specifically listed does not defeat a trust. *See* 20 Pa.C.S. § 7732(a)(4), cmt. (explaining that "a validating duty [of a trustee] may also be passive, implying only that the trustee has an obligation not to interfere with the beneficiary's enjoyment of the trust property").

Finally, none of the parties has even asserted that the trust clause is vague or that they have had any difficulty identifying the property in question when they

---

**18.** Moreover, to the extent adoption of the PAUTA changed existing law regarding the creation of trusts, its effective date was November 6, 2006, and the actions of Peters Creek Church in 2001 must be evaluated according to the law as it existed at the time: "Under the common law, the past actions of trustees, beneficiaries and others regarding trusts are governed by the legal principle in effect when the actions occurred. Chapter 77 does not change those common law concepts." PAUTA, Jt. St. Govt. Comm. Cmt., applicability cmt.

**19.** Likewise, the writings in this case satisfy the requirements of Section 5103 of the Non–Profit Corporation Law of 1988 (Non–Profit Corporation Law) which defines a "Trust Instrument" as "[a]ny lawful deed of gift, grant, will or **other document** by which the donor, grantor or testator shall give, grant or devise any real or personal property or the income therefrom in trust for any charitable purpose." 15 Pa.C.S. § 5103 (emphasis added).

filed their respective complaints seeking control of the church's real and personal property. Indeed, for this Court to hold that the clear and unambiguous instruction to hold property "in trust for the use and benefit" of a church is subject to numerous interpretations, and to expand the requirements for creating a charitable trust, invites future challenges and surcharge actions as the provisions of existing trusts are called into question. For these reasons, and despite the thoughtful opinion below, the trial court erred in its analysis when it ruled in favor of the Majority on this issue.

## VI. THE CORPORATION'S 2007 VOTE TO DISAFFILIATE

Having decided that Peters Creek Church in 2001 expressed its intent to be bound by the provisions of the PCUSA Constitution and to hold its property in trust for the PCUSA, we turn to whether the corporation's vote in 2007 to again amend the bylaws and to disaffiliate from the PCUSA effectively undid what occurred in 2001.

On April 27, 2007, the Majority notified the Washington Presbytery of its intent to be dismissed from the PCUSA to the EPC. The Washington Presbytery proceeded pursuant to the Book of Order and appointed a commission to determine whether to dismiss Peters Creek Church. On May 7, 2007, the Majority filed suit in the trial court to determine the title of the church's real and personal property and seeking an emergency injunction to prevent the Washington Presbytery from taking over the corporation. The trial court entered the injunction, but it was later dissolved by agreement of the parties. On September 9, 2007, the Majority voted to request the Washington Presbytery for

dismissal from the PCUSA. (Affidavit of Robert J. Elmes, ¶ 6, Ex. A to Majority Mot. for Summ. J., Nov. 30, 2009, Case No. 2008–7967 ("Elmes Affidavit")). On October 5, 2007, the Minority presented an Overture to the Washington Presbytery, the ecclesiastical equivalent of filing a complaint in a civil court, to determine what should happen to the church and formally announcing the schism to the Presbytery. (Washington Presbytery Answer, New Matter, and Counterclaims, July 24, 2008, Case No. 2007–2941 ("Wash. Presby. Answer")), Ex. G, (R.R. at 191a).[20]

By letter dated October 25, 2007, the Majority, through their attorneys, notified the Washington Presbytery that a special meeting was called for November 4, 2007, to vote on a motion to disaffiliate from the PCUSA and to affiliate with the EPC. (Wash. Presby. Answer, Ex. C) (R.R. at 181a). In response, by letter dated October 31, 2007, the Washington Presbytery informed Peters Creek Church that "[o]nly the Washington Presbytery, and not Peters Creek United Presbyterian Church, has the power to divide, dismiss or dissolve churches," citing the appropriate provision of the Book of Order, and directed the church not to conduct the vote. (Wash. Presby. Answer, Ex. D) (R.R. at 183a). The letter also informed Peters Creek Church that if the vote proceeded and the Session voted to disaffiliate, they would be removing themselves from membership with the PCUSA. (*Id.*).

On November 4, 2007, the Majority held the special meeting and voted (1) to terminate "its voluntary affiliation with the [PCUSA] and voluntarily affiliate itself with the [EPC]," and (2) to revise the bylaws "to the extent that all references to the Constitution (including the Book of

---

**20.** The procedural facts recited here are undisputed. (*See* Wash. Presby. Answer, R.R. at 131a–143a; Majority Reply to Wash. Presby. Answer, R.R. at 201a–225a.).

Order) of the PC(USA) are hereby revised to refer to the commensurate sections of the Constitution of the EPC; and the following clause will be added to the end of Article I: 'provided, however, that nothing contained herein shall interfere with the right of Peters Creek Church United Presbyterian Church to voluntarily affiliate with any particular denomination.' " [21] (Elmes Affidavit ¶ 11).

Following the vote, Peters Creek Church Reverend L. Rus Howard renounced the jurisdiction of the PCUSA. (Wash. Presby. Answer, Ex. E) (R.R. at 185a). The Majority also expelled from its rolls those church members that remained loyal to the PCUSA. (Elmes Affidavit ¶¶ 13–16). On November 27, 2007, pursuant to the Book of Order, the Presbytery assumed control of the Session of Peters Creek Church because the elected Session had disassociated itself with the PCUSA and was unable to discharge its constitutional duties to the PCUSA. (Wash. Presby. Answer, Ex. F) (R.R. at 187a). The Presbytery's commission ultimately ruled on January 19, 2008, that the Minority is the "True Church" of the PCUSA. (Wash. Presby. Answer, Ex. B) (R.R. at 169a–172a).

The trial court found that the Majority's November 4, 2007 vote was effective under the Non–Profit Corporation Law. (Oct. 1, 2009, Trial Court Op. at 14–15; March 31, 2010, Trial Ct. Op. at 9–10). The trial court held that it could not enforce a covenant not to disaffiliate because it "would be a violation of the free exercise clause." (March 31, 2010, Trial Ct. Op. at 16). The court continued that "a court acting to prevent a corporation from affiliating with a religious denomination would certainly prohibit the free exercise of religion and

violate both the federal and state constitutions," citing *Beaver–Butler* and *Calhoun* as examples of other Pennsylvania cases that have upheld the ability of a local church to disaffiliate from a national denomination. (March 31, 2010, Trial Ct. Op. at 15, 16 n. 25). The court also ruled that the clause in the Book of Order restricting disaffiliation was not binding because Peters Creek Church never expressly consented to it. (*Id.* at 10).

The Minority argues that the Majority's vote on November 4, 2007, was not valid because Peters Creek Church had previously passed bylaws that prohibited any future bylaw amendment that would be inconsistent with the PCUSA Constitution, and because Peters Creek Church had already incorporated in its bylaws and acceded to the provisions of the Book of Order that control, *inter alia,* whether and how a local church can disaffiliate from the PCUSA. The Majority counters that the November 2007 vote was proper under the bylaws and the Non–Profit Corporation Law, and, as a result, the Book of Order and the bylaw provisions that formerly referenced the PCUSA are no longer binding on Peters Creek Church. The Majority also argues that Peters Creek Church was only voluntarily affiliated with the PCUSA and that, as such, it could terminate its voluntary affiliation anytime it wished. We find that the November 4, 2007, vote was invalid.

At the outset, we note that the dispute over control of the corporation can be resolved under neutral principles of law by applying the Non–Profit Corporation Law and examining the appropriate corporate documents. The issue is whether the corporate acts of Peters Creek Church are

---

**21.** The EPC does not require or request that its member churches hold their property in trust for the denomination.

permitted by the law and we need not delve into a religious thicket to make that determination.

## A. The Corporate Charter

 A non-profit corporation is required to file a charter, also called articles of incorporation, that set forth, among other things, "A brief statement of the purpose or purposes for which the corporation is incorporated." 15 Pa.C.S. § 5306(a)(3).[22] It is axiomatic that a corporation's bylaws cannot conflict with its charter. *Lynn v. Freemansburg Bldg. & Loan Assoc.*, 117 Pa. 1, 12, 11 A. 537 (1887); *Meena*, 19 A.3d at 1199–1200 (Leavitt, J., dissenting) (noting that corporate charter would trump any inconsistent bylaw provisions).

 As quoted above, the 1931 Charter of Peters Creek Church provides that its sole and express purpose is the "worship of Almighty God according to the faith, doctrine, discipline and usages of the United Presbyterian Church of North America." The PCUSA is the successor entity of the UPCNA, and it is undisputed that Peters Creek Church has been a participating member of the UPCNA and all of its successors since 1931 until November 4, 2007.[23] It is clear that the Majority vote on November 4, 2007, to amend the church bylaws to remove all references to the denomination to which it was dedicated in the Charter and to join a different denomination violates the charter and the laws of Pennsylvania. *See Merman v. St. Mary's Greek Catholic Church*, 317 Pa. 33, 176 A. 450 (1935) (holding that a provision in the charter of a religious corporation requiring members to have specified religious beliefs is not unconstitutional nor clearly antagonistic to statutes and must be obeyed by members and successors until amended by an appropriate judicial tribunal).

The decision in *St. James the Less*, where the Supreme Court rejected a similar attempt by the local church to free itself from the denomination, compels reversal here. The vestry of St. James the Less (*i.e.*, the local church government) considered separating from the Episcopal Diocese in 1997, decades after the trust clause was added to the national canons. *St. James the Less*, 585 Pa. at 436, 888 A.2d at 800. The vestry formed a new non-profit corporation, the charter and bylaws of which did not pledge allegiance to the national denomination. *Id.* In 1999, the vestry adopted a plan to merge into the new corporation and a majority of the members voted to approve the plan. *Id.* The vote was 212–13 of the members present at the meeting. *Id.* Pursuant to the national canons, a standing committee of the Diocesan Bishop declared the new corporation and its members ineligible to act on behalf of the local church and appointed the Bishop as trustee of church property. *Id.* A majority of the local church members refused to abide by the Bishop's decision. *Id.* at 437, 888 A.2d at 801. The Diocese, in response, filed suit. *Id.* The Supreme Court, in addition to declaring that the property of St. James the Less was held by the local church in trust for the Episcopal Diocese, rejected the local church's majority vote to create a new corporation

---

22. The Non–Profit Corporation Law defines articles of incorporation to include "what have heretofore been designated by law as certificates of incorporation or charters." 15 Pa.C.S. § 5103.

23. The Majority admits that Peters Creek Church was affiliated with the PCUSA, but that it was a "voluntary" member and could withdraw at any time. No evidence is cited and there is nothing in the record to support that contention or that the PCUSA or its predecessors permitted "voluntary" members.

that was not bound by the preexisting church charter, bylaws or the denomination's canons. *Id.* at 451–52, 888 A.2d at 810. The Supreme Court reinstated the minority members of the church and ordered the corporation to act as trustees of its property for the benefit of the Episcopal Diocese. *Id.* The situation here is similar and the outcome should be the same.

## B. The Corporate Bylaws

In addition to violating the Charter, the vote on November 4, 2007, was prohibited by the bylaws. Prior to the November 2007 vote, the Peters Creek Church bylaws subjected all bylaw amendments to the Constitution and Book of Order of the PCUSA. (June 3, 2001 Bylaws, Art. X, quoted above). Prior to the November 2007 vote, the bylaws recognized that the Constitution and Book of Order of the PCUSA were "obligatory" upon the church and its members, stated that "nothing in these bylaws shall prevail over the Constitution," and incorporated "the mandatory provisions and requirements on local churches set forth in the Book of Order." (*Id.*, Art. I, quoted above). The bylaws also recognized that Peters Creek Church is a "particular" church of the PCUSA. (*Id.*).

In addition to adopting the mandatory provisions of the Book of Order, four of the eleven articles of the bylaws expressly referenced the Book of Order. Regarding the right of a local church to leave the PCUSA, the Book of Order is unequivocal: "The relationship to the Presbyterian Church (U.S.A.) of a particular church can be severed only by constitutional action on the part of the presbytery." Book of Order at G–8.0601 (R.R. at 933a). *See also* Book of Order at G–11.0103i (R.R. at 958a) ("The presbytery . . . has the responsibility and power . . . (i) to divide, dismiss, or

dissolve churches in consultation with their members.").

Prior to the November 2007 vote, the bylaws also subjected the authority of the church Session and the trustees to conduct the affairs of the church according to the provisions of the PCUSA Constitution. The bylaws provided that the church Session consists of "the pastor or co-pastors, the associate pastors, and the elders in active service" and that the Session's responsibilities "shall be [*inter alia*] those listed in Chapter X, Sections G–10.0102 . . . of the Book of Order." (June 3, 2001 Bylaws, Art. IV.) That provision of the Book of Order provides that the Session has the responsibility for "observing and carrying out the instructions of the higher governing bodies consistent with the Constitution of the [PCUSA]." Book of Order at G–10.0102(p)(4) (R.R. at 950a–951a). Prior to the November 2007 vote, the bylaws provided that the duties of the board of trustees "shall include [*inter alia*] the exercise of the powers and authorities vested in them by civil law . . . all subject to the authority of the session and in accordance with the provisions of Section G–7.0402 of the Book of Order." (June 3, 2001 Bylaws, Art. VI.) That section of the Book of Order directs particular churches to form and maintain a corporation "[w]henever permitted by civil law," and that the corporation's and the individual trustees' powers shall be "subject to the authority of the session and under the provisions of the Constitution of the [PCUSA]." Book of Order at G–7.0402 (R.R. at 931a). The bylaws also provided that special meetings of the church, like the one held on November 4, 2007, can only be called by the trustees or by the Session or the Presbytery directing the trustees to do so. (June 3, 2001 bylaws, Art. III.)

Peters Creek Church is bound to follow its own bylaws, which incorporated the

rules of the denomination to which it bound itself. 15 Pa.C.S. § 5505.[24] According to those rules, a simple majority vote of the corporation is insufficient to sever Peters Creek Church from the PCUSA. (June 3, 2001 Bylaws, Art. VI); Book of Order at G–7.0402, G–8.0601, G–11.0103i (R.R. at 930a–931a, 933a, 958a). Accordingly, Peters Creek Church's vote to disaffiliate from the PCUSA is invalid under the rules to which it agreed to be bound. Moreover, because the bylaw amendments adopted on November 4, 2007, excised all references to the PCUSA Constitution, they are clearly not consistent with the PCUSA Constitution and are, accordingly, unauthorized. Finally, because the Washington Presbytery directed Peters Creek Church, by letter of October 31, 2007, not to conduct the vote on November 4, 2007, and informed them that it would violate the PCUSA Constitution, the Session and trustees of Peters Creek Church were bound by the bylaws not to conduct the vote. Indeed, the bylaws effective prior to the November 2007 vote prohibited the trustees from even calling a vote to unilaterally disaffiliate, because such a vote would have violated the PCUSA Constitution (G–8.0601 and G–11.0103i) and the trustees' authority was circumscribed by the PCUSA Constitution (June 3, 2001 Bylaws, Art. VI (expressly incorporating Book of Order section G–7.0402)).

■ The issue becomes, then, whether a non-profit corporation may, under the Non–Profit Corporation Law, delegate its authority to join or leave a parent religious organization to that organization, such that a majority vote of the corporation's members would not be effective. Although this question has not been directly answered by a Pennsylvania court, an analysis of the Non–Profit Corporation Law and applicable cases reveals that such delegation is permissible.

■ Pennsylvania law has long recognized that religious societies may operate through a non-profit corporation. The "advancement of religion" is one of the many permissible "charitable purposes" for which a non-profit corporation may be organized. 15 Pa.C.S. § 5103. The Non–Profit Corporation Law does not prohibit the delegation of powers by a corporation to another entity, including a hierarchical church or religious denomination, and our Supreme Court has held that corporations may take any act that is not prohibited, not simply those acts enumerated in the articles or bylaws. *Borden v. Baldwin,* 444 Pa. 577, 583, 281 A.2d 892, 896 (1971).

The statutory provisions regarding bylaws provide that they are binding on a corporation and may contain "any provisions for managing the business and regulating the affairs of the corporation not inconsistent with law or the articles...." 15 Pa.C.S. §§ 5504, 5505. Further, the Non–Profit Corporation Law recognizes that corporations may adopt "provisions relating to the government and regulation of the affairs of the corporation" that are based in "canon law":

> If and to the extent canon law applicable to a corporation incorporated for religious purposes shall set forth provisions relating to the government and regulation of the affairs of the corporation which are inconsistent with the provisions of this subpart on the same subject, the provisions of canon law shall control to the extent, and only to the extent, required by the Constitution of

---

24. There is no evidence that the 2001 bylaw amendments were inconsistent with Peters Creek Church's articles of incorporation. We also note that the amendments are consistent with the corporate charter, which expressly pledges allegiance to the national denomination.

the United States or the Constitution of Pennsylvania or both.

15 Pa.C.S. § 5107. *See also* 15 Pa.C.S. § 5767 (establishing that bylaws may grant voting rights to, *inter alia*, an "other entity prohibited by law from becoming a member of a corporation"); 15 Pa.C.S. § 5983 (establishing the right of a superior religious organization, expressly including a presbytery, to petition a court to hold proceedings regarding the involuntary windup or dissolution of a corporation "organized for the support of public worship" when "it is made to appear that by reason of shifting population, withdrawal of membership, or any other cause whatsoever, the corporation has ceased to support public worship within the intent and meaning of its articles"); 15 Pa.C.S. § 5721 (permitting a corporation in its bylaws to delegate the powers of the board of directors to "such other body", defined at section 5103 as "a person or group, other than the board of directors"). Because the delegation of corporate governance issues is permissible and proper, the delegation here by Peters Creek Church is binding and the corporation is bound to follow its own bylaws, which incorporate the rules of the denomination to which it bound itself.

■ The trial court erroneously found that enforcing Section G–8.0601 of the Book of Order would violate neutral principles and the Establishment Clause by favoring the PCUSA over the right of Peters Creek Church to worship in the manner that it sees fit. To the contrary, enforcement of Peters Creek Church's commitment to the PCUSA is required by neutral principles if that commitment does not violate the laws of the Commonwealth. The non-profit corporation Peters Creek Church unequivocally incorporated into its own governing documents the mandatory provisions of the Book of Order, including the commitment not to disaffiliate without permission from the Washington Presbytery. Enforcement of those documents, in accordance with neutral principles, does not prevent any individual member of Peters Creek Church from exercising his or her religious preference to leave the Presbyterian Church (U.S.A.) and join the Evangelical Presbyterian Church, or any other church, or no church at all.

The trial court relied on the holdings in *Beaver–Butler* and *Calhoun* as examples of other Pennsylvania cases that have upheld the ability of a local church to disaffiliate from a national denomination (March 31, 2010, Trial Ct. Op. at 15). Those cases, however, do not support the trial court's conclusions because their facts make clear that, at the time the local churches disaffiliated from the UPCUSA, the predecessor of the PCUSA, the UPCUSA governing documents did not prevent local churches from unilaterally disaffiliating.[25] Here, in contrast, the PCUSA Constitution, which Peters Creek Church recognized as obligatory on its members, provided that the relationship between the PCUSA and an individual church can be severed only by the Presbytery.

For the above-stated reasons, the trial court's orders are reversed in part and vacated and remanded in part.

### ORDER

AND NOW, this *30th* day of *April*, 2014, the orders of the Court of Common Pleas in the above matters, dated March 31,

---

**25.** Likewise, the Majority's argument that Peters Creek Church was merely voluntarily affiliated with the PCUSA and could terminate the relationship, *sua sponte*, at any time, is unavailing. The undisputed documentary evidence is unequivocal: Peters Creek Church is a "particular" church of the PCUSA. The Majority cite no record evidence, other than the 2007 amended bylaws, that Peters Creek Church was merely a voluntary affiliate of the PCUSA, or that the PCUSA would have permitted Peters Creek Church to remain a voluntary affiliate after it became a "particular" church.

2010, and October 1, 2009, are RE-VERSED in part and VACATED and REMANDED in part, as follows:

1. The Washington Presbytery and the Presbyterian Church (U.S.A.) ("PCUSA") are the beneficial owners of all real and personal property titled in the name of Peters Creek United Presbyterian Church ("Peters Creek Church") or the trustees thereof.

2. Peters Creek Church shall retain legal title to its property as trustee for the Washington Presbytery and the PCUSA.

3. The Majority shall refrain from interfering with Peters Creek Church's use of the property consistent with its duties and obligations as trustee for the Washington Presbytery and the PCUSA.

4. The trial court's order of October 1, 2009, (1) granting quiet enjoyment of real property to Peters Creek Church without interference of the Washington Presbytery, (2) granting sole possession of personal property to Peters Creek Church, and (3) declaring that the Washington Presbytery and the PCUSA have no interest in Peters Creek Church property, is REVERSED.

5. The trial court's order of October 1, 2009, dismissing the Washington Presbytery's counterclaims, and the trial court's order of March 31, 2010, (1) finding control of the corporation known as Peters Creek United Presbyterian Church is vested in the Majority, and (2) dismissing the Amended Complaint of Richard L. St. Clair, *et al.*, are VACATED.

6. The matter is remanded to the trial court to enter an order disposing of the previously dismissed and now reinstated counterclaims of the Washington Presbytery and Amended Complaint of the minority faction of Peters Creek Church, represented by Richard St. Clair, *et al.*, consistent with this opinion and order.

Jurisdiction is relinquished.

CONCURRING/DISSENTING OPINION BY Judge McCULLOUGH.

I concur with the Majority insofar as it concludes that this Court must defer to the Washington Presbytery's ecclesiastical determination of which of the two factions of Peters Creek United Presbyterian Church (Peters Creek Church) is the "True Church" within the Presbyterian Church (U.S.A.) (hereafter PCUSA), that this determination does not control the fate of the property at issue, and that our United States Supreme Court's decision in *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), does not allow a national denomination to create a trust by unilaterally including language in a constitution without the express intent of the local church. However, because I believe that the Majority's interpretation of a by-law amendment runs afoul of long-established trust principles and does not follow the standards set forth by our Pennsylvania Supreme Court in *In Re Church of St. James the Less,* 585 Pa. 428, 888 A.2d 795 (2005) and *Presbytery of Beaver–Butler of United Presbyterian Church v. Middlesex Presbyterian Church,* 507 Pa. 255, 268, 489 A.2d 1317, 1324 *cert. denied,* 474 U.S. 887, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985), I strongly disagree that the record in this case establishes an intent on behalf of Peters Creek Church to hold the property in trust for the benefit of the PCUSA and that the November 4, 2007 vote of the majority of the members of Peters Creek Church to disaffiliate from the PCUSA was invalid.

*A Trust Was Never Created Under The Standards Established By Our Supreme Court In Presbytery Of Beaver–Butler And St. James The Less*

As the Majority notes, in order to find that a trust has been created, the record

must contain "clear and unambiguous language or conduct evidencing an intent to create a trust." *Presbytery of Beaver–Butler*. Moreover, "[i]t is not necessary that the terms 'trust' and 'trustee' should be used. The donor need not say in so many words, 'I declare myself trustee,' but he **must do something which is equivalent to it, and use expressions which have that meaning.**" *In re Smith's Estate*, 144 Pa. 428, 435–36, 22 A. 916, 917 (1891) (emphasis added).

While the Majority correctly indicates that Peters Creek Church voted on June 3, 2001, to amend its bylaws to recognize that the provisions of the Constitution of the PCUSA are obligatory on Peters Creek Church and its members, *these bylaws do not specifically incorporate the Book of Order's unilateral trust clause provision or otherwise reference an intent to hold the property in trust for the PCUSA.* In other words, no trust language is ever referenced in the bylaw amendments. Indeed, in *Presbytery of Beaver–Butler*, our Pennsylvania Supreme Court cautioned that "lack of formality does not obviate the necessity for the appearance of all the elements of a completed trust. Every trust symptom must be present, regardless of informality surrounding the inception of the relationship, or none exists." *Id.* at 269, 489 A.2d at 1324 (quoting *Bair v. Snyder County State Bank*, 314 Pa. 85, 89, 171 A. 274, 275 (1934)).

Here, the record does not contain clear and unambiguous language or conduct evidencing an intent to create a trust. The inclusion in the bylaws of adoption of the PCUSA Constitution does not manifest all elements necessary for a completed trust. The specific terms of the trust are left to venture. As noted above, the Supreme Court in *Presbytery of Beaver–Butler* has stated that all the particulars of a trust must be present for one to exist, formally

or informally. Included among the foregoing is some writing evidencing the trust. The term "Trust instrument" is defined in section 5103 of the Nonprofit Corporation Law of 1988 (Nonprofit Corporation Law), 15 Pa.C.S. § 5103, as "*[a]ny lawful deed of gift, grant, will or other document* by which the donor, grantor, or testator shall give, grant or devise any real or personal property or the income therefrom in trust for any charitable purpose." (Emphasis added.) Here, the record is devoid of the required elements of such a trust instrument. There is no trust document, contract, deed, will, or other document separately signed and agreed to by Peters Creek Church. Additionally, the record is devoid of any identification of the specific *res* of the supposed trust. Further, even if it is a trust, nothing in the record indicates that the trust is irrevocable and that Peters Creek Church would be precluded from revoking the trust when it withdraws from the PCUSA.

If, as the Majority asserts, a trust exists on the basis of a general bylaw incorporation of the Book of Order and one phrase using the term "in trust," we are left to determine what are the terms of the trust. The term "in trust" has various meanings depending upon the context. That ambiguity, together with the need to find that the bylaws constitute the requisite "writing," are simply too tenuous to conclude there is a trust in this situation. The Supreme Court in *Presbytery of Beaver–Butler* specifically cautioned against reliance on the Book of Order, stating as follows:

> The Commonwealth Court's reliance on selected passages from the Book of Order was misplaced in that the court ignored the overall intent of that book as a means of overseeing the spiritual development of member churches. In addition, these selected provisions, which at

most evidence the putative trustee's desired interpretation, are far from constituting the clear unequivocal evidence necessary to support a conclusion that a trust existed.

*Id.* at 269–70, 489 A.2d at 1325.

Furthermore, this case is clearly distinguishable from *St. James the Less*, 585 Pa. 428, 888 A.2d 795 (2005), where the Supreme Court found that St. James the Less held its property in trust for the benefit of the Protestant Episcopal Church of the Diocese of Pennsylvania (Diocese) and the National Episcopal Church because St. James amended its charter to include specific trust language and acceded to Diocesan canons wherein it agreed to hold its property for the work of the Diocese and not to alienate or encumber its property without the Diocese's consent.

St. James the Less was founded in 1846. The original charter declared that St. James' purpose was to "[worship] Almighty God according to the faith and discipline of the [National Episcopal Church]" and that "it accedes to, recognizes, and adopts the constitution, canons, doctrine, discipline, and worship of the [Diocese and the National Episcopal Church]." *Id.* at 431, 888 A.2d at 797. More importantly, this charter further stated that St. James would not alienate any of its property without the Diocese's consent.[1] Shortly thereafter, the charter was approved by the National Episcopal Church and St. James was admitted into the Diocese.

A few months later, St. James acquired its first parcel of land, upon which it erected a church. Between 1850 and 1923, St. James mortgaged its property twice to obtain four more plots of land in the area surrounding the church, which it used for a churchyard/burial ground, a rectory, a schoolhouse, a sexton's house, a parish house, and a bell tower. St. James received the approval of the Standing Committee, a governing body with the National Episcopal Church, prior to obtaining these mortgages.

With the Diocese's approval, St. James made minor amendments to its charter in 1919 and 1967. The 1919 amendment removed the alienation language of the original charter and added a provision stating that if St. James were to dissolve, its property would be placed in trust "for some existing or future Congregation of Members of the [Diocese]." *Id.* at 433, 888 A.2d at 798. Moreover, by acceding to the Diocesan and National Episcopal Church's canons in the 1967 amended charter, St. James agreed to the alienation provisions of those canons, which not only required St. James to obtain the Diocese's consent before alienating its property, but also to hold its property "for the work of the [Diocese]." *Id.*

In 1997, St. James began considering separating from the Diocese and the National Episcopal Church. St. James' vestry thereafter filed articles of incorporation and bylaws with the Department of State creating a new nonprofit corporation named the CSJL Foundation into which St. James could merge. In 1999, a majority of the members of St. James voted in favor of this merger. The Diocese thereafter filed a declaratory judgment action with the local common pleas court seeking

---

1. Specifically, the charter stated as follows:
 The said Corporation shall not, by deed, fine, or recovery, or by any other means, without the assent of the [Diocese], previously had and obtained, grant, sell, alien, or otherwise dispose of any lands, messuages, tenements, or hereditaments in them vested, nor charge nor encumber the same to any person or persons whomsoever.
 *St. James the Less*, 585 Pa. at 431, 888 A.2d at 797.

a declaration that (1) St. James had effectively dissolved, (2) the merger was null and void, and (3) the Diocesan Bishop was the trustee of St. James' property. The common pleas court granted the latter two requests, finding that the merger was invalid for several reasons, including the failure to obtain the approval of the Diocese, and that the Diocesan canons clearly identified the Bishop as the trustee of all church property in the Diocese.

On appeal, this Court affirmed. We concluded that St. James was bound by a canon enacted by the National Episcopal Church in 1979, referred to as the "Dennis Canon," which expressly stated that the property of churches affiliated with the National Episcopal Church is held in trust for the benefit of said Church and the Diocese. Specifically, the Dennis Canon stated that:

> All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this [National Episcopal Church] and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission, or Congregation otherwise existing over such property as long as the particular Parish, Mission or Congregation remains a part of, and subject to, this Church and its constitution and Canons.

*Id.* at 440, 888 A.2d at 803. We noted that St. James remained a member of the Diocese and the National Episcopal Church for twenty years following the adoption of this canon. Further, we noted that St. James never established an intent to retain possession and control of church property.

Our Supreme Court likewise affirmed. Specifically, the Supreme Court cited the charter of St. James wherein it agreed to hold its property in trust for the Diocese. The Supreme Court also noted that St. James had acceded to the Diocesan canons wherein it agreed to hold its property for the work of the Diocese and not to alienate or encumber its property without the Diocese's consent. The Supreme Court described these provisions as "clear evidence that St. James intended to create a trust over its property in favor of the Diocese." *Id.* at 451, 888 A.2d at 809. These factors are not present in the case *sub judice.*

Peters Creek Church was founded as a Presbyterian church in the 1790s and incorporated as a non-profit corporation in 1931. The charter of Peters Creek Church states the purpose of the corporation is "the worship of Almighty God according to the faith, doctrine, discipline and usages of the United Presbyterian Church of North America." (1931 Charter at 1, Reproduced Record (R.R.) at 15a.) At the time of incorporation, Peters Creek Church was affiliated with the "United Presbyterian Church in North America" (UPCNA), the predecessor of the PCUSA. In 1958, the UPCNA merged into the "United Presbyterian Church in the United States of America." In 1983, that entity merged to become what is currently named the PCUSA.

Significantly, unlike in *St. James the Less,* here there is no declaration in Peters Creek's charter that if it ever dissolves, "its property will be placed in trust for the Diocese," and no agreement to take and hold its property "for the work of the [Diocese]." *Id.* at 450–51, 888 A.2d at 809. Indeed, this critical language does not appear in the charter or bylaws of Peters Creek Church. Also significant is that the acquisition by St. James of its first parcel of land upon which it erected a church structure was *after* its completed charter had already been approved by the diocese. Inapposite here, Peters Creek purchased

its first property in 1809, well before amendment of its bylaws or submission of its charter to PCUSA or its predecessors.

In other words, not only was the charter language emphasized by the Supreme Court in *St. James the Less* lacking in Peters Creek Church's charter, there was no language in the charter or even in the bylaws regarding a trust. Indeed, a change was never made to Peters Creek Church's charter and the amendments to the bylaws were bereft of any such trust language. These distinctions further serve to underscore the lack of requisite intent, language, or actions to create a trust for the benefit of the PCUSA as established by the Supreme Court in *St. James the Less,* especially in the absence of an express declaration issued and signed by Peters Creek Church.

This matter is also distinguishable from *Conference of African Union First Colored Methodist Protestant Church v. Shell,* 659 A.2d 77 (Pa.Cmwlth.), *appeal denied,* 542 Pa. 676, 668 A.2d 1138 (1995), another case relied on by the Majority to conclude that a trust was created herein. In *Shell,* Reverend Willie Shell and others founded St. Paul's African Union First Colored Methodist Protestant Church of Lancaster (St. Paul's) in November 1977. At the time, St. Paul's filed articles of incorporation specifically stating its purpose as that of "Christian Worship and Fellowship subject to the law and usage of the Holy Bible and the Book of Discipline of the African Union First Colored Methodist Protestant Church of the United States of America. . . ." *Id.* at 78. This Book of Discipline stated that should a local church disband, all property of the local church "shall remain in the possession of the [national church]." *Id.* St. Paul's did not acquire its church building until 1980. In other words, St. Paul's was affiliated from its inception with the national church and ac-

ceded to its Book of Discipline, including the trust language contained therein and did not purchase its building until after this affiliation.

Peters Creek Church was founded in the 1790s and did not incorporate until 1931. Peters Creek Church's incorporating documents, i.e., its charter, stated its purpose as "the worship of Almighty God according to the faith, doctrine, discipline and usages of the [UPCNA, a predecessor to the PCUSA]." (R.R. at 15a.) However, the charter does not reference the Book of Order, let alone any purported trust language. As noted by the Majority, the unilateral trust language did not appear in the Book of Order until 1981. Peters Creek Church acquired its property in 1809, well before any affiliation with the PCUSA or the PCUSA's predecessors, and always retained all property in its own corporate name. Moreover, Peters Creek Church amended its bylaws, not its charter, a significant distinction not at issue in *Shell.*

### The Peters Creek Church Property Was Never Bequeathed, Devised, Or Conveyed To The PCUSA

The property at issue here was never *bequeathed, devised, or conveyed* by Peters Creek Church to the PCUSA. Section 7 of the Act of April 26, 1855, P.L. 328, *as amended,* 10 P.S. § 81 (relating to charities and welfare), provides, *inter alia,* that real property which has been bequeathed, devised, or conveyed to an ecclesiastical corporation, bishop, or other person for the use of any church, congregation, or religious society is subject to their control in accordance with the rules, regulations, or canons of such church. The terms bequeath, devise, and convey are defined terms with specific connotations. "Bequeath" means "to assign or transfer real or personal property by formal declaration either *inter vivos* or after death." *Black's*

*Law Dictionary* 179 (9th ed. 2009). "Devise" is defined as "the act of giving property by will." *Black's Law Dictionary* 517 (9th ed. 2009). "Convey" means "to transfer or deliver (something, such as a right or property) to another, esp. by deed or other writing." *Black's Law Dictionary* 383 (9th ed. 2009).

There is nothing in the record as found by the trial court that would reflect that church property was ever bequeathed, devised, or otherwise conveyed to the PCUSA. Had it been, this matter would have been readily resolved pursuant to this section. The lack of any bequest, devise, or conveyance to the PCUSA also mitigates against the imposition of a trust under these circumstances, where no trust instrument exists and the actions of the church and the language in its bylaws do not meet the test of *St. James the Less* and *Presbytery of Beaver–Butler.*[2]

### *The November 4, 2007 Vote To Amend The Bylaws And The Nonprofit Corporation Law*

Even assuming arguendo that the required elements of a completed trust were present, the November 4, 2007 vote to disaffiliate was valid and would therefore have terminated the trust. PCUSA's argument that the attempt of Peters Creek Church to disaffiliate and amend its bylaws was null and void fails to properly consider section 5504(a) of the Nonprofit Corporation Law, 15 Pa.C.S. § 5504(a), which addresses the adoption, amendment, and contents of a nonprofit corporation's bylaws. Specifically, section 5504(a) provides as follows:

(a) General rule.—The members entitled to vote shall have the power to adopt, amend and repeal the bylaws of a nonprofit corporation. Except as provided in subsection (b), the authority to adopt, amend and repeal bylaws may be expressly vested by the bylaws in the board of directors or other body, subject to the power of the members to change such action. The bylaws may contain any provisions for managing the business and regulating the affairs of the corporation not inconsistent with law or the articles. In the case of a meeting of members, written notice shall be given to each member entitled to vote that the

---

**2.** We note that this case is clearly distinguishable from that line of cases which have confirmed the primacy of the authority of church officers of higher church authorities over the disposition of church property notwithstanding the objections of a local congregation which utilized the same and, indeed, funded the same where a trust or conveyance was already established. *See, e.g., St. Peter's Roman Catholic Parish v. Urban Redevelopment Authority of Pittsburgh,* 394 Pa. 194, 146 A.2d 724 (1958), *cert. denied,* 359 U.S. 435, 79 S.Ct. 940, 3 L.Ed.2d 931 (1959) (holding that the bishop owned the property in trust for the parish and he alone could dispose of it in accordance with the canons of the Roman Catholic Church); *Post v. Dougherty,* 326 Pa. 97, 191 A. 151 (1937) (holding that the appointment of a Cardinal as trustee to oversee the disposition of property of a suppressed parish was proper and that members of the former congregation had no standing to maintain an action to enforce property rights); *St. Matthew's Slovak Roman Catholic Congregation v. Wuerl,* 106 Fed.Appx. 761 (3d Cir.2004) (holding that the real property associated with each of two suppressed parishes was held in trust by the bishops for the benefit of the congregations and the members of these suppressed parishes hold no interest in the former parish property); *Roman Catholic Congregation of St. Elizabeth Church v. Wuerl,* 22 Pa. D. & C.4th 391 (C.P.Wash.1994) (holding that even though church property was held in trust for the parishioners, the conveyed property was subject to the control and the disposition of church officials and the parishioners had no proprietary rights in the church property). Unlike the case before us, those cases involved disputes between local congregations and church hierarchy officers, *e.g.,* diocesan bishops, in which ownership of the church property was already in the name of those church officers.

purpose, or one of the purposes, of a meeting is to consider the adoption, amendment or repeal of the bylaws. There shall be included in or enclosed with the notice a copy of the proposed amendment or a summary of the changes to be effected thereby. Any change in the bylaws shall take effect when adopted unless otherwise provided in the resolution effecting the change.

15 Pa.C.S. § 5504(a).

First, the Majority offers no law which prohibits a corporation from amending its bylaws. There is nothing in Peters Creek Church's charter and we have found no state or federal law prohibiting such amendments. Secondly, the bylaws of Peters Creek Church provided that the bylaws "may be amended subject to the provisions of the charter of this corporation and the laws of the Commonwealth of Pennsylvania, at any meeting of the congregation or corporation called for that purpose, by a vote of not less than a majority of those present entitled to vote." (June 3, 2001 Bylaws, Art. X.) Peters Creek Church passed the amendment at a meeting of the corporation on November 4, 2007, by a majority vote.

Moreover, the 2001 bylaw amendment recited that it was subject to the proviso that it did not prevail over the corporate charter. (June 3, 2001 Bylaws, Art. I.) The corporation's charter supersedes the bylaws and is always the primary document of the corporation. The Majority offers no authority for its proposition that a corporation's bylaws can prevent subsequent amendments. If this claim were true, then one group of corporate members could effectively bind all successive members. This would unduly limit the corporation's ability to govern itself, which would

be contrary to the very purpose of the bylaws.

Additionally, the unilateral provision in the Book of Order vesting the sole power with the PCUSA, a separate, unaffiliated, nonprofit corporation, to "divide, dismiss, or dissolve" member churches such as Peters Creek Church,[3] a separate, independently created nonprofit corporation, appears impermissible under section 5107 of the Nonprofit Corporation Law. While the Book of Order references the authority of the Washington Presbytery to "divide, dismiss, or dissolve" member churches, (R.R. at 958a), it does not prohibit a member church from voting to disaffiliate. Indeed, the October 31, 2007 letter from the Washington Presbytery to Peters Creek Church referenced by the Majority, (op. at 117), states that the term "disaffiliation" is not contained within the Book of Order and recognizes that a vote to disaffiliate equates to a removal of membership with the PCUSA.

Section 5107 addresses government and regulation and provides as follows:

> If and to the extent canon law applicable to a corporation incorporated for religious purposes shall set forth provisions relating to the government and regulation of the affairs of the corporation which are *inconsistent with* the provisions of this subpart on the same subject, the provisions of canon law shall control *to the extent, and only to the extent, required by the Constitution of the United States or the Constitution of Pennsylvania, or both.*

15 Pa.C.S. § 5107 (emphasis added).

In this case, the Book of Order provision vesting the PCUSA with the sole power described above is inconsistent with the Nonprofit Corporation Law because it interferes with the ability of Peters Creek

---

**3.** *See* Section G–11.0103(i) of the Book of Order. (R.R. at 958a.)

Church, an independently established nonprofit corporation, to establish and amend its bylaws, including bylaws addressing dissolution and/or disaffiliation as well as other governance matters. Peters Creek Church purchased and owns property. It is not a corporate subsidiary or affiliate of the PCUSA and the PCUSA is not its parent corporation. While Peters Creek Church can establish bylaws consistent with the Book of Order, it cannot in these circumstances be prohibited from validly amending the same.

Moreover, the Nonprofit Corporation Law states that inconsistent canon law provisions only control to the extent required by the Constitution of the United States and/or the Constitution of Pennsylvania. Here, the Book of Order provision creating a unilateral trust for the benefit of the PCUSA is inconsistent with Peters Creek Church's bylaw amendment and clearly not required by the Constitution of the United States or Pennsylvania.[4]

Finally, any reliance by the Majority on sections 5767 and 5983 of the Nonprofit Corporation Law, 15 Pa.C.S. §§ 5767, 5983, is misplaced. The Majority relies on these sections in support of its assertion that Peters Creek Church's bylaw amendment adopting the rules of, and delegating corporate governance to, the PCUSA prior to November 2007 were binding. Section 5767 addressed voting powers and provided, during the time period at issue, as follows:

> Such power to vote in respect to the corporate affairs and management of a nonprofit corporation and other membership rights as may be provided in a bylaw adopted by the members may be conferred upon:
>
> (1) registered holders of securities evidencing indebtedness issued or to be issued by the corporation;
>
> (2) The Commonwealth or any political subdivision thereof or other entity prohibited by law from becoming a member of a corporation.

15 Pa.C.S. § 5767.[5] Section 5983 provides that:

> The court may, in the case of any nonprofit corporation organized for the support of public worship, upon application of the diocesan convention, presbytery, synod, conference, council, or other su-

---

4. While Peters Creek Church amended its bylaws to establish affiliation with the PCUSA, the First Amendment of the United States Constitution and Article 1, section 3 of the Pennsylvania Constitution preclude the PCUSA from unilaterally imposing its continued affiliation on the majority of Peters Creek Church, a nonprofit corporation. The First Amendment to the United States Constitution provides that:

 Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

 U.S. CONST. amend. I. Article 1, section 3 of the Pennsylvania Constitution provides that:

 All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience, and no preference shall ever be given by law to any religious establishments or modes of worship.

 PA. CONST. art. I, § 3. To say that members of the Peters Creek Church, an independently established church, cannot otherwise quit and join the evangelical church appears fundamentally at odds with these constitutional provisions.

5. Section 5767 was amended effective September 9, 2013, to address the appointment of a custodian in cases of a voting deadlock or other cause.

pervising or controlling organization of which the corporation is a member or with which it is in allegiance and to which it is subordinate, entertain proceedings for the involuntary winding up and dissolution of the corporation when it is made to appear that by reason of shifting population, withdrawal of membership or any other cause whatsoever, the corporation has ceased to support public worship within the intent and meaning of its articles and the dissolution of the corporation may be effected without prejudice to the public welfare and the interests of the members of the corporation.

When Peters Creek Church amended its bylaws on June 3, 2001, it did not confer upon the PCUSA any membership rights, let alone the power to vote in matters related to corporate affairs or management. Peters Creek Church simply agreed to recognize the Constitution of the PCUSA, subject at all times to its own charter. Additionally, the Washington Presbytery points to no law prohibiting the PCUSA or any of its directors from becoming a member of Peters Creek Church. Section 5983 applies to an involuntary dissolution initiated by the national church. In the present case, the majority members of Peters Creek Church initiated the ac-

tion with its November 4, 2007 vote to disaffiliate. Under the Majority's reasoning, this vote would forever bind all future congregations of Peters Creek Church, a result which runs contrary to the constitutional mandates addressed above.

Because the record supports the trial court's findings that Peters Creek Church never intended to hold its property in trust for the benefit of the PCUSA, that the requisite intent, language, or actions needed to create a trust as set forth by our Supreme Court in *St. James the Less* and *Presbytery of Beaver–Butler* are lacking, most importantly that Peters Creek Church never amended its charter, and that the November 4, 2007 vote to disaffiliate from the PCUSA was a proper corporate action, I would affirm the trial court's October 1, 2009 and March 31, 2010 orders.

Judges LEADBETTER and LEAVITT join in this concurring/dissenting opinion.