**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-2023
_____

VERNON W. HILL, II; BRIAN TIERNEY; BARRY
SPEVAK,
Derivatively on Behalf of Republic First Bancorp Inc.

v.

ANDREW B. COHEN; LISA JACOBS;
HARRY MADONNA; HARRIS WILDSTEIN;
REPUBLIC FIRST BANCORP INC.,

Andrew B. Cohen, Lisa Jacobs,
Harry Madonna, Harris Wildstein,
                                    Appellants
_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. No. 2-22-cv-1924)
District Judge:  Honorable Paul S. Diamond
_____

Argued
June 28, 2022

Before: JORDAN, PORTER, and PHIPPS, *Circuit Judges*

(Filed: July 6, 2022)
_____

Andrew M. Erdlen
John S. Summers
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square
18th & Cherry Streets, 27th Floor
Philadelphia, PA 19103

Frank Olander
Michael E. Swartz [**ARGUED**]
Schulte Roth & Zabel
919 Third Avenue
New York, NY 10022
        *Counsel for Appellants*

Amit Agarwal [**ARGUED**]
Holland & Knight
315 South Calhoun Street, Suite 600
Tallahassee, FL 32301

Tracy Z. Quinn
Carolyn P. Short
Holland & Knight
2929 Arch Street, Suite 800
Philadelphia, PA 19104

Martin L. Seidel
Holland & Knight
31 West 52nd Street, 12th Floor
New York, NY 10019
    *Counsel for Appellees*

_____

OPINION OF THE COURT
_____

**JORDAN**, *Circuit Judge*.

Under Pennsylvania law, a court has the power to appoint a custodian to take control of a corporation if the corporation's board of directors is deadlocked or if the directors' acts are illegal, oppressive, fraudulent, or wasteful. 15 Pa. Cons. Stat. §§ 1767(a)(3), 1981(a). But that power should be "used sparingly, with caution and circumspection, and only in an extreme case[.]" *Tate v. Phila. Transp. Co.*, 190 A.2d 316, 321 (Pa. 1963).

This is not such an extreme case, though its facts are dramatic. The eight-person Board of Directors of Republic First Bancorp, Inc. ("Republic First" or "FRBK"[1]) became evenly split into two factions – one led by the current CEO, Vernon W. Hill, II (the "Hill Directors"), and one led by the former CEO, Harry D. Madonna (the "Madonna Directors") – with competing visions for the future of Republic First and its bank subsidiary. The deadlock persisted until May 10,

_____

[1] "FRBK" is Republic First's stock ticker symbol on the NASDAQ.

2022, when one of the Hill Directors died. The Madonna Directors immediately used their newfound numerical advantage to start rearranging the bank's leadership and to take steps to fill the vacancy on the Board with an ally. The Hill Directors sued in the District Court to make them stop.

Within hours of receiving the complaint, the District Court ordered the Madonna Directors to cease their actions while it considered whether to appoint a custodian. Nine days later, without an evidentiary hearing or fact-finding, the Court did appoint a custodian to take control of Republic First and to hold a special shareholders' meeting to fill the vacant Board seat. The following month, the District Court – without prompting from any shareholder or Board member – directed the custodian to add an additional seat to the Board and to fill that seat at the special shareholders' meeting as well.

The District Court's decision to displace the corporate governance structure of a publicly traded company, while no doubt well-intended, did not reflect the required caution, circumspection, or justification for such a drastic step. Republic First's bylaws (the "Bylaws") provide instructions for how the Board should proceed after the death of a director, and, in this case, the Madonna Directors followed those instructions. They were and are entitled to fill the vacancy, thus presumptively giving them a Board majority. The District Court abused its discretion by hastily supplanting the Bylaws with its own process for filling the vacancy. Because the Madonna Directors were acting pursuant to the Bylaws when they took steps to appoint a new director, there was no deadlock, illegality, oppression, or any other ground for appointing a custodian for Republic First. Having expedited

4

consideration of the Madonna Directors' appeal, we will now reverse.

## I.   BACKGROUND[2]

The Board of Republic First is split into two factions that are engaged in a contentious battle over the future of the company.  The first faction is led by Hill, current CEO of Republic First.  His allies are Brian Tierney and Barry Spevak, and, prior to his passing, also included Theodore Flocco.  The other faction is led by Madonna, founder and former CEO of Republic First.  Madonna's allies are Andrew Cohen, Lisa Jacobs, and Harris Wildstein.  In general, the Hill Directors' vision for Republic First is to press forward with its current strategy, which is focused on expanding its retail banking business and adding new branch locations, while the Madonna Directors have indicated an interest in refinancing or selling the company.

Those competing visions created tension on the Board and began playing out in public ahead of this year's upcoming annual shareholders' meeting, at which the seats of three Hill Directors, including Hill himself, are up for election.  The first indication that the upcoming Board election would be unusually eventful came in October 2021, when Driver Opportunity Partners I, LP ("Driver"), a shareholder of Republic First, sent a letter to the Board criticizing Hill's leadership and the retail-expansion business strategy.  Driver

---

[2] The following background section is based on the allegations of the Hill Directors' complaint and what we understand to be, from the record provided, undisputed facts.

5

called for the removal of Hill from the Board and from his position as CEO. A month later, Driver submitted a slate of three Board candidates to replace Hill and two of Hill's allies, Spevak and Flocco.

Driver is not the only activist investor interested in the upcoming Board election. In January 2022, a group of shareholders consisting of Phillip Norcross, Gregory Braca, and the Avery Conner Capital Trust (collectively, the "Norcross Group") sent a letter to the Board proposing several business strategy changes and suggesting that Hill be replaced as CEO. The Norcross Group wanted to meet with the Board about its proposals, but "Hill indicated no interest on his part in any discussions[.]" (App. at 73.) That prompted the Norcross Group to announce that it intended to solicit proxies in opposition to the incumbent directors.

Around this same time, the Madonna Directors began signaling their interest in a sale of Republic First. On multiple occasions, they "proposed to vote, and voted, in favor of entertaining inquiries and possible offers for the sale of FRBK and have vigorously advocated for a sale to the Norcross Group[.]" (App. at 73.) The Hill Directors opposed a sale, arguing that the company is still in the middle of its expansion strategy and that the recent market conditions for bank stocks would result in unfavorable deal terms.

Despite the divergent views on the merits of a sale, the Board unanimously nominated Hill, Spevak, and Flocco for re-election as Republic First's slate of candidates at the annual shareholders' meeting. That cooperation quickly unraveled, however, when the Board's compensation committee (which

6

included Spevak and Flocco) voted to not renew Madonna's employment agreement with Republic First.[3]

The next week, on March 4, 2022, the Madonna Directors issued a press release accusing the Hill Directors of self-dealing and mismanagement (the "March Press Release"). Captioned "Concerned Republic First Bancorp Directors Oppose Potential Harmful Actions by Other Company Board Members," the press release raised three "concerns":

1. the "[e]xtension of a contract to have a company owned by Hill's wife … handle architecture, interior design and related services for the bank's branches";

2. "[a]greements obligating the incurring [of] expenses related to the opening of new branches and the renovation of existing ones"; and

3. "proposed amendments to certain employment contracts that would provide significantly augmented severance payments to, and risk retention of, key executives should Hill be voted off the company's board at the upcoming annual meeting or cease to serve as CEO."

(App. at 75.) The March Press Release garnered significant press coverage. Days later, the Norcross Group filed a lawsuit in Pennsylvania state court against Republic First and the Hill Directors, based entirely on the allegations in the March Press

_____

[3] The complaint does not identify the entirety of the compensation committee nor the nature of Madonna's current employment agreement.

7

Release. Almost simultaneously, the Norcross Group offered an investment of at least $50 million in exchange for a 51% stake in Republic First, the right to nominate at least two members to the Board, and the resignation of Hill as chairman and CEO. The lawsuit was later withdrawn, and the Board has not acted on the offer, despite interest from the Madonna Directors.

The March Press Release also led Republic First's independent auditor, Crowe LLP, to express concern about the forthcoming audit of Republic First's financial statements for the 2021 fiscal year. Crowe asked each director to sign a letter representing that there was no substance to the concerns expressed in the March Press Release. When the Madonna Directors and the Hill Directors failed to agree on the contents and conditions of such a letter, Crowe notified them that it would not certify Republic First's financial statements until an independent investigation of the company had been completed. The two Board factions agreed to hire Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale") as independent legal counsel to conduct that investigation. In the meantime, however, Republic First would have no audited financial statements, leaving it unable to file its Form 10-K for the 2021 fiscal year or solicit proxies for its proposed slate of directors. The Board anticipated that it would have to delay its annual shareholders' meeting until after it could file the 10-K. During this time, Driver continued to solicit proxy votes for its slate of Board candidates.

The unexpected upheaval leading directly to this suit arrived on May 10, when Flocco, one of the Hill Directors, passed away. Two days later, Madonna called a special meeting of the Board for May 13. The Hill Directors did not

8

attend that meeting, but the Madonna Directors, pressing forward with a new 4-to-3 majority on the Board, proceeded to remove Hill as Chairman of the Board, install Madonna as Interim Chairman, authorize Madonna to approve external communications on behalf of Republic First in certain situations, and remove certain executives from the board of directors of Republic First's bank subsidiary. Later that day, the Madonna Directors published a press release notifying shareholders of the change in leadership (the "May Press Release"). On May 16, Madonna called for two more special board meetings – one on May 17 at 9:30 PM, and the next on May 18 at 1:00 PM – intending, among other things, to appoint a new director to fill the vacancy left by Flocco.

In response, the Hill Directors filed this lawsuit on the afternoon of May 17. Their verified complaint alleged that the Madonna Directors (a) breached fiduciary duties, (b) violated section 14(a) of the Securities Exchange Act of 1934, (c) violated section 13(d) of the Exchange Act, and (d) violated Republic First's Bylaws. The complaint requested, among other forms of relief, the appointment of a custodian to manage Republic First, pending the outcome of the litigation. The Hill Directors simultaneously filed a motion for a TRO and preliminary injunction barring the Madonna Directors from holding the proposed May 17 or 18 meetings or from making any further board-level changes. The TRO motion did not, however, request a custodian.

At 5:30 that same afternoon, the District Court held a hearing to consider the emergency motion. It denied the TRO without prejudice and instructed the parties to enter into a status quo order. The Court noted that it was inclined to find that the Madonna Directors were violating the Bylaws by

9

conducting business at Board meetings without a proper quorum. It also suggested that it was strongly considering appointing a custodian to fix the company's "big mess," even telling the parties that it had "already got one picked out." (App. at 185, 190.) After the hearing, the Court directed the Madonna Directors to submit a brief addressing the Hill Directors' request for the appointment of a custodian. The Madonna Directors filed their brief and an affidavit attaching multiple news articles and press releases regarding Hill's alleged self-dealing, the letters from Driver and the Norcross Group referenced in the complaint, the March Press Release, and the May Press Release. Otherwise, there was no presentation or consideration of evidence beyond the Hill Directors' verified complaint and the documents referenced in it.

On May 26, the Court issued an order which it described in its accompanying opinion as "appoint[ing] a Custodian to take control of Republic First." (App. at 20.) It held that the Madonna Directors' actions at the May 13 special board meeting were likely ultra vires and illegal, because the four Madonna Directors did not constitute a proper quorum for transacting official business at Board meetings. It construed the Bylaws as requiring a majority of the eight-seat Board – five directors – to form a quorum or to fill a vacancy on the Board. Since the Madonna Directors were unable to meet that threshold on their own, and because the Hill Directors refused to attend any Board meetings called by Madonna, the District Court concluded that the Board was deadlocked. The Court also listed other reasons for appointing a custodian, including that the accusations between the two parties were injuring the public's confidence in Republic First.

10

Alfred W. Putnam, an attorney at Faegre Drinker Biddle & Reath LLP in Philadelphia, was selected by the Court to serve as Custodian of Republic First. The Court at first gave him two duties, the first particular and the second very broad indeed: (1) "Calling and overseeing a Special Shareholders' Meeting to take place on or before July 10, 2022, at which Republic First shareholders shall elect a new Director to replace the late Theodore Flocco"; and (2) "Taking any and all lawful actions necessary to manage Republic First in its shareholders' best interests, including, should the Custodian so decide, the election of a ninth director[.]" (App. at 27.) The Madonna Directors immediately appealed the appointment of the Custodian, and we granted their motion to expedite this appeal.

While the appeal was pending, the Custodian filed a motion to extend the deadline for holding the special shareholders' meeting from July 10 to July 29. The Madonna Directors responded and proposed that Mr. Putnam not convene a special shareholders' meeting at all. Their reasoning was that WilmerHale had informed Republic First that its investigation would wrap up by the end of July, so audited financial statements and the necessary securities filings could be completed in time to hold the company's annual shareholders' meeting in September. Since the shareholders would be electing three directors at that meeting, including the director seat made vacant by Flocco's death, the Madonna Directors said it would be a waste of time and money to hold a proxy contest in July – to vote on a director who might only be in office for two months – and then hold another meeting in September.

The Custodian objected to cancelling the special shareholders' meeting, arguing that the Madonna Directors' timeline was just an optimistic estimate and that the actual meeting might not be held until October or later. Norcross supported the Custodian's plan to hold the special meeting in July. But Driver agreed with the Madonna Directors' idea to defer the election until the annual meeting. Most notably, even the Hill Directors joined with the Madonna Directors' request to dispense with a special meeting in July. They emphasized that the Custodian's opinion on the timing of the meeting was unnecessary because there was no deadlock on this issue. All the directors agreed that the vote could wait until the regular shareholders' meeting. As the Hill Directors put it, "FRBK's entire Board has carefully considered the best interests of FRBK's shareholders … and provided the Court with a unified position of FRBK's Board." (Dist. Ct. D.I. 44 at 3.)

Despite that, the District Court rejected the Board's position and adopted the Custodian's proposal to hold the meeting in late July. And then the District Court went even further. After noting that the two factions "have not come to any agreement as to how the Company should proceed after the election" and that the Board will remain deadlocked "[i]f the Hill Faction's candidate is elected," it stated:

> To prevent a continuing 4-4 Board split, the
> Custodian is directed to conduct that election so
> that shareholders will elect both a replacement
> for Mr. Flocco and a ninth Director.

(Dist. Ct. D.I. 46 at 1-2.) In short, having earlier given the Custodian the power and discretion to create a new board seat,

12

the Court now directed the Custodian to do so. That order was issued on June 24, and we heard oral argument on June 28.

## II.   DISCUSSION

Before turning to the merits of the District Court's order appointing a custodian, we address two jurisdictional arguments: one made by the Hill Directors challenging our appellate jurisdiction, and one by the Madonna Directors challenging the District Court's subject matter jurisdiction. Finding neither challenge persuasive, we then turn to the merits of the District Court's order and hold that the Court abused its discretion by appointing a custodian based on a misinterpretation of the Bylaws and without a more developed factual record.

### A.   Appellate Jurisdiction

Our jurisdiction is typically limited to orders finally disposing of a case, 28 U.S.C. § 1291, but we also have jurisdiction to hear interlocutory appeals of "orders appointing receivers, or refusing orders to wind up receiverships or to take steps to accomplish the purposes thereof, such as directing sales or other disposals of property[,]" 28 U.S.C. § 1292(a)(2). The Hill Directors argue that we have no jurisdiction under that provision here because the District Court appointed a custodian, not a receiver. We are unconvinced by their fixation on labels.

The simple fact that the District Court's appointee was called a "custodian" is not determinative. "A receiver by any other name, or by no name, is still a receiver." *In re Pressman-Gutman Co.*, 459 F.3d 383, 393 (3d Cir. 2006) (quoting *United*

13

*States v. Sylacauga Props., Inc.*, 323 F.2d 487, 490 (5th Cir. 1963)). We determine whether an appointee is a receiver under § 1292 by considering "the purposes of the receivership and the extent of the powers possible in the situation." *Id.* (citation omitted).

The Hill Directors highlight the distinct roles of receivers and custodians under Pennsylvania law. They are correct that a state statute says a custodian "continue[s] the business of the corporation" while a receiver "liquidate[s] its affairs and distribute[s] its assets." 15 Pa. Cons. Stat. § 1767(c). That is consistent with traditional nomenclature in corporate law. *See* 3 James D. Cox & Thomas Lee Hazen, *Treatise on the Law of Corporations* § 14:15 (3d ed. 2021). But what the word "receiver" means in § 1292, and hence whether we have appellate jurisdiction, is a matter of federal, not state, law.

Federal courts have held that a variety of duties and responsibilities will qualify someone as a "receiver" under § 1292. Most clearly, a person who is appointed to liquidate a company is a receiver. *E.g.*, *Sriram v. Preferred Income Fund III Ltd. P'ship*, 22 F.3d 498, 501 (2d Cir. 1994). But receivers are not only those operating in a liquidation context. A person appointed to "take[] possession of and preserve[], pendente lite, and for the benefit of the party ultimately entitled to it, the fund or property in litigation" is also a receiver – specifically, a receiver pendente lite. *E.g.*, *F.T.C. v. World Wide Factors, Ltd.*, 882 F.2d 344, 348 (9th Cir. 1989). And receivers are also not limited to possessing and preserving assets. Section 1292's use of "receiver" also covers individuals appointed to "manage, operate, and control" a corporation during the pendency of a legal proceeding. *E.g.*, *Chase Manhattan Bank,*

14

*N. A. v. Turabo Shopping Ctr., Inc.*, 683 F.2d 25, 26 (1st Cir. 1982); *accord, e.g.*, *Lyman v. Spain*, 774 F.2d 495, 497 (D.C. Cir. 1985). Having an ability to control the assets or corporation can in fact be a defining characteristic of a receiver. In *In re Pressman-Gutman*, the district court appointed a guardian ad litem to replace the administrators of an ERISA benefits plan for the limited purpose of prosecuting an ERISA lawsuit against those administrators. 459 F.3d at 390. Distinguishing that guardian ad litem from a receiver, we emphasized that the guardian ad litem only had control over the lawsuit and not the "myriad duties, functions and responsibilities related to managing the Plan's assets." *Id.* at 394 & n.10; *see also Hewlett-Packard Co. v. Quanta Storage, Inc.*, 961 F.3d 731, 741 n.6 (5th Cir. 2020) (holding that a constable who merely receives assets is not a "receiver").

When looking beyond labels to consider what the Custodian's actual purpose and powers are here, he looks much like a receiver pendente lite. *See* 15 Pa. Cons. Stat. § 1767(c) (granting a custodian "all the power and title of a receiver" other than to liquidate and distribute assets). He was appointed pursuant to the Hill Directors' request for a custodian "to manage the affairs of FRBK pending the outcome of this litigation." (App. at 102.) The District Court found that a custodian was necessary because the infighting was harming Republic First's assets, and a custodian would preserve "public confidence in the institution" and "provide reassurance to shareholders and the trading public that fraudulent conduct will not occur." (App. at 18-19.) The Court gave the Custodian the power to "[take] any and all lawful actions necessary to manage Republic First in its shareholders' best interests." (App. at 27.) In other words, the Custodian was appointed to manage and control Republic First to preserve its value during

15

the course of this lawsuit. That makes him a "receiver" under § 1292.

Furthermore, to consider the Custodian a receiver under § 1292 is consistent with the purpose of that jurisdictional statute. "Congress decided to make interlocutory orders appointing receivers appealable under § 1292(a)(2) because they curtail property rights in a way that may cause great harm." *United States v. Solco I, LLC*, 962 F.3d 1244, 1250 (10th Cir. 2020) (internal quotation marks omitted). That great harm is a result of the receivership order "foreclosing independent action and decision in irreparable ways." 16 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3925 (3d ed. 2015). The appointment of the Custodian for Republic First threatens precisely that type of harm. It is no slur upon Mr. Putnam, a litigator well-known and respected in our legal community, to say that his appointment foreclosed the method established by the Bylaws for filling the vacancy on the Board with an interim director. The election of a ninth director – which was never requested by any director or shareholder – likewise would undermine the independence of Republic First to make its own corporate governance decisions. To construe § 1292(a)(2) as not allowing appellate review where a custodian's powers go *beyond* just possessing and preserving the company – which would itself justify appellate jurisdiction – would defeat the purpose of the provision. We have jurisdiction over this appeal pursuant to § 1292(a)(2), and we will exercise it.

16

### B.  Subject Matter Jurisdiction

The Madonna Directors contend on appeal that the District Court could not have appointed a custodian because it lacked subject matter jurisdiction.  We disagree.

In general, the District Court has federal question jurisdiction over all claims arising under federal law.  28 U.S.C. § 1331.  In very limited circumstances, a purported federal claim will not create subject matter jurisdiction because it "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citation omitted).  The standard for dismissing a federal claim as wholly insubstantial is "especially high[.]"  *Davis v. U.S. Sentencing Comm'n*, 716 F.3d 660, 666 (D.C. Cir. 2013).  Jurisdiction is not defeated merely because "the averments might fail to state a cause of action on which [the plaintiff] could actually recover," *Steel Co.*, 523 U.S. at 89 (citation omitted), nor because "the legal theory alleged is probably false[,]" *Davis v. Wells Fargo*, 824 F.3d 333, 350 (3d Cir. 2016) (citation omitted).  Instead, we will dismiss a federal claim for lack of subject matter jurisdiction only when the claim is "so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy."  *Wells Fargo*, 824 F.3d at 350 (citation omitted).

The Hill Directors asserted two claims under the Exchange Act, and, without prejudging them, those federal claims are not wholly insubstantial.  The Hill Directors' first federal claim arises under section 13(d), which requires the

17

disclosure of detailed information "[w]hen two or more persons agree to act together for the purposes of acquiring, holding, or voting equity securities of an issuer[.]" 17 C.F.R. § 240.13d-5(b)(1). Indicators of such a group can include a common objective or coordinated action. *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 618 (2d Cir. 2002); *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 127 (2d Cir. 2001). Here, the Hill Directors allege that the Madonna Directors formed a group with Driver and the Norcross Group to oppose the re-election of three Hill Directors at the upcoming shareholders' meeting and to instead elect directors who would support a sale of the company. Specifically, they alleged that such a group is evidenced by the Madonna Directors' efforts to entertain acquisition offers from the Norcross Group, the Madonna Directors issuing the March Press Release, and the Norcross Group filing a corresponding lawsuit days later. They also point to one of the Madonna Directors serving on the board of a company where a candidate on Driver's slate also works. That evidence supports at least a colorable argument that the Madonna Directors formed a group with Driver and the Norcross Group for the purpose of voting Republic First shares at the shareholder meeting. If that argument holds up, the Madonna Directors will have violated section 13(d) by not making the required disclosures.

The Hill Directors' second federal claim arises under section 14(a) of the Exchange Act, which, through follow-on regulations, imposes procedural and substantive requirements on proxy solicitations. 17 C.F.R. §§ 240.14a-3, -6, -9. The regulations define a "solicitation" as, among other things, "[t]he furnishing of … other communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy[.]" *Id.*

§ 240.14a-1(*l*)(1)(iii). Some courts take an expansive view of what communications qualify as solicitations. *E.g.*, *Long Island Lighting Co. v. Barbash,* 779 F.2d 793, 796 (2d Cir. 1985) (applying the proxy solicitation rules to press releases that "constitute a step in a chain of communications designed ultimately to [request the furnishing of proxies]"). Here, the Hill Directors allege that the March Press Release and May Press Release were proxy solicitations that violated the securities requirements. That claim is not insubstantial or frivolous. Although the Madonna Directors challenge whether the press releases were proxy solicitations, the contents and timing of the announcements can at least plausibly be characterized as meant to sway shareholders to vote against the Hill Directors who were standing for re-election. Under an expansive view of the regulations, there is a colorable claim that they are a step in a chain of communications with the goal of achieving that outcome.

The Hill Directors' Exchange Act claims are thus not so "wholly insubstantial" that they fail to create federal question jurisdiction. *Steel Co.*, 523 U.S. at 89. And because the state law claim to appoint a custodian shares "a common nucleus of operative fact" with the federal claims, it is amenable to supplemental jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); 28 U.S.C. § 1367(a). It was therefore within the District Court's power to exercise subject matter jurisdiction over the state law corporate governance claim.[4]

---

[4] We review for abuse of discretion a district court's decision to exercise supplemental jurisdiction. *Cf. Elkadrawy v. Vanguard Grp., Inc.*, 584 F.3d 169, 174 (3d Cir. 2009) (reviewing for abuse of discretion the district court's decision

19

## C.     Grounds for Appointing a Custodian[5]

Section 1767(a)(3) of title 15 of the Pennsylvania Consolidated Statutes permits a court to appoint a custodian "of and for any business corporation when it is made to appear that … the conditions specified in section 1981(a)(1), (2)[,] or

---

to decline supplemental jurisdiction); *see also Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) ("[W]e review the district court's decision to exercise such jurisdiction under an abuse-of-discretion standard."). In this instance, however, we need not delve deeply into that exercise of discretion, as the parties have not addressed the issue and any complaint about it has been forfeited. It is sufficient to observe that we do not perceive an abuse of discretion.

[5] We review the District Court's decision to appoint a custodian for abuse of discretion. *Maxwell v. Enter. Wall Paper Mfg. Co.*, 131 F.2d 400, 403 (3d Cir. 1942). A court abuses its discretion if its "decision rests upon a clearly erroneous finding of fact, an errant conclusion of law[,] or an improper application of law to fact." *EEOC v. City of Long Branch*, 866 F.3d 93, 97-98 (3d Cir. 2017) (citation omitted).

The interpretation of bylaws is subject to our plenary review. *Peters Creek United Presbyterian Church v. Wash. Presbytery of Pa.*, 90 A.3d 95, 104 (Pa. Commw. Ct. 2014). "When we interpret corporate bylaws, we must use the same rules applicable to the interpretation of statutes." *M4 Holdings, LLC v. Lake Harmony Ests. Prop. Owners' Ass'n*, 237 A.3d 1208, 1218 (Pa. Commw. Ct. 2020) (citation and internal quotation marks omitted).

(3) … exist with respect to the corporation." There are five conditions specified in section 1981:

(1) The acts of the directors are illegal,
(2) The acts of the directors are oppressive,
(3) The acts of the directors are fraudulent,
(4) The corporate assets are being misapplied or wasted, or
(5) The directors are deadlocked, the shareholders are unable to break the deadlock, and the corporation is suffering or being threatened to suffer irreparable injury.

*See* 15 Pa. Cons. Stat. § 1981(a). The District Court found that each of those five grounds individually justified the appointment of the Custodian in this case. The Court's conclusions, however, are based on a faulty interpretation of the Bylaws and on unsupported findings of facts. Accordingly, they cannot stand.

### 1. Illegality, Oppression, and Deadlock

The District Court found that the Madonna Directors acted illegally and oppressively and that the Republic First Board was deadlocked. Each of those conclusions was based on the Court's interpretation of the Bylaws as requiring at least five of the Board's full complement of eight directors to be present to form a quorum and conduct any business, including filling any Board vacancy. Based on that interpretation, the Court held that the four Madonna Directors violated the Bylaws by their actions at the May 13 special board meeting and by intending to fill the Board's vacancy at the May 17

21

special board meeting.[6] Similarly, it held that the Madonna Directors' attempt to "wrest immediate control of Republic First" was oppressive, as those actions likely violated the Bylaws and "are thus ultra vires or unjust." (App. at 18.) Finally, it concluded that the Board was deadlocked because neither faction could muster enough directors to form a five-person quorum. Each of those conclusions, however, is based on an unsupportable interpretation of the Bylaws.

Article II, Section 7 of the Bylaws addresses the process for filling vacancies on the Board. Its first two sentences state:

> Any vacancies in the Board of Directors, whether arising from death, resignation, removal or any other cause except an increase in the number of directors, *shall be filled by a vote of the majority of the Board of Directors then in office even though that majority is less than a quorum.* A majority of the entire Board may fill a vacancy that results from an increase in the number of directors.

(App. at 45 (emphasis added).)

That language is unambiguous. If a vacancy on the Board arises from the death of a director, the majority of the remaining directors must fill that vacancy, regardless of

---

[6] The District Court held that violating the Bylaws was illegal under title 15, section 1505 of the Pennsylvania Consolidated Statutes, which states that the directors of a corporation are bound by its bylaws.

22

whether they form a quorum. Based on that clear language, the four Madonna Directors, who constituted a majority of the seven remaining directors, had the power and in fact the obligation to fill the vacancy left by Flocco.

Contrary to the District Court's holding, the clarity of Section 7 is not "obscured" by its third sentence. (App. at 16.) That sentence reads:

> In the event that at any time a vacancy exists in any office of a director that may not be filled by the remaining directors, a special meeting of the shareholders shall be held as promptly as possible and in any event within sixty (60) days, for the purpose of filling the vacancy or vacancies.

(App. at 45.) The District Court construed "may not be filled" to mean "shall not be filled," and then expressed confusion at why Section 7 would, in the first two sentences, address situations where the remaining directors shall fill a vacancy and then, in the third sentence, imply that there are situations where they shall not fill a vacancy. Based on that perceived inconsistency, the Court concluded that Section 7 did not permit the remaining directors to fill a vacancy.[7]

---

[7] The District Court also reasoned that Republic First's articles of incorporation "seem to contemplate the filling of Directorships only by shareholder election." (App. at 17.) The articles of incorporation indeed provide that shareholders will elect directors to three-year terms at each annual shareholders' meeting, but they do not exclude the availability of interim, temporary appointments to the Board. Section 7 of the Bylaws

23

But Section 7's third sentence does not generate ambiguity. Combined with the first two sentences, it leads to a consistent and logical understanding of the Bylaw: The remaining directors must fill a vacancy with a majority vote; if the remaining directors are unable to fill the vacancy – such as when the vacancy leaves the Board with an even number of directors who are deadlocked – then the shareholders must fill that vacancy. That clear construction gives effect to every sentence of Section 7, and it makes sense. The District Court needlessly stretched its reading of "may not be filled" to create an inconsistency, making no discernable effort to harmonize the provisions before tossing out that crucial Bylaw. *See Keystone Fabric Laminates, Inc. v. Fed. Ins. Co.*, 407 F.2d 1353, 1356 (3d Cir. 1969) ("It is axiomatic in contract law that two provisions of a contract should be read so as not to be in conflict with each other if it is reasonably possible."). That was error.

The Hill Directors do not defend the District Court's analysis. Rather, their main argument is that a quorum is still required for the remaining Board members to fill a vacancy, and Section 7's contrary language – "the majority of the Board of Directors then in office *even though that majority is less than a quorum*" – only comes into play if there are not enough directors remaining to mathematically form a quorum. They

provides that "[a]ny director elected or appointed to fill a vacancy shall hold office for the balance of the term then remaining and until a successor has been chosen[.]" (App. at 45.) That does not conflict in any way with the articles of incorporation.

24

are correct that, "[a]s a general rule[,] the directors of a corporation may bind a corporation only when they act at a legal meeting of the board." *Stone v. Am. Lacquer Solvents Co.*, 345 A.2d 174, 176 (Pa. 1975). And a legal meeting requires a quorum, unless the bylaws provide otherwise. 15 Pa. Cons. Stat. § 1727(a). Their argument fails here, however, because the Bylaws plainly do provide otherwise.

Moreover, Section 7 of the Bylaws tracks Pennsylvania's default rule for filling vacancies on the boards of corporations: "Except as otherwise provided in the bylaws[,] [v]acancies in the board of directors … may be filled by a majority vote of the remaining members of the board though less than a quorum, or by a sole remaining director[.]" *Id.* § 1725(b)(1)(i). Pennsylvania courts have not addressed whether the phrase "though less than a quorum" overrides the general quorum requirement even when a quorum is possible, but Delaware courts have provided helpful guidance in applying their substantively identical statute, 8 Del. C. § 223(a)(1). Ninety years ago, the Delaware Court of Chancery flatly stated that a bylaw implementing section 223(a)(1) meant that "a majority of the remaining directors may [fill a vacancy] regardless of whether a quorum of the board is left in office or not." *In re Chelsea Exch. Corp.*, 159 A. 432, 434 (Del. Ch. 1932). That interpretation has not been abrogated by any later decision.

Nevertheless, the Hill Directors cite two cases they believe signal that *Chelsea Exchange* is no longer good law. The first is *Applied Energetics, Inc. v. Farley*, 239 A.3d 409 (Del. Ch. 2020). But *Applied Energetics* was not about filling board vacancies. Rather, it was about whether a single director could transact business even though he alone did not constitute

25

a quorum under his company's bylaws. The Court of Chancery held that he could not, but it pointed to section 223(a)(1) as one of the very few instances in which a board *can* act without a quorum. *Id.* at 426-47. The *Applied Energetics* decision did not cite *Chelsea Exchange*.

The second case is *Tomlinson v. Loew's Inc.*, 134 A.2d 518 (Del. Ch.), *aff'd*, 135 A.2d 136 (Del. 1957). In *Tomlinson*, the company had a bylaw that expressly granted to the board the power to fill vacancies. *Id.* at 523. The company also had a second bylaw allowing for vacancies to be filled by a majority of the remaining directors even if not a quorum, similar to the bylaw in *Chelsea Exchange* (and here). *Id.* at 524. The Court of Chancery acknowledged the holding from *Chelsea Exchange*, but it held that the existence of the first bylaw made *Chelsea Exchange* distinguishable. The court said that the two bylaws worked together to create a tiered framework: If there were enough directors to form a quorum, the first bylaw required board action at a meeting with a quorum; if there were not enough directors to form a quorum, the second bylaw permitted the remaining directors to fill vacancies with a majority vote, regardless of any quorum requirement. *Id.* at 525-28. In our case, however, there is no separate Bylaw that specifically grants the Board the power to fill vacancies. The Hill Directors' request to have us adopt the same framework as in *Tomlinson* is therefore without any foundation in the governing documents of Republic First.[8]

---

[8] The Hill Directors further claim that the Madonna Directors cannot fill a Board vacancy without first allowing the Board's Nominating Committee to recommend a candidate. The responsibilities of the Nominating Committee, as listed in its charter, include "[i]dentify[ing] individuals qualified to

The Bylaws here unambiguously permit – in fact, require – the remaining directors in office to fill the vacancy with a majority vote, regardless of whether those voting to fill the vacancy constitute a quorum. The Madonna Directors constitute four of the seven remaining directors, so they have sufficient numbers to fill the vacancy. Because the Bylaws give the Madonna Directors the power and obligation to fill the vacancy, their efforts to do so were not illegal or oppressive, and there is no deadlock on the Board.[9] The District Court's

become Board members" and, "[i]n the case of a vacancy in the office of a director, … recommend[ing] to the Board an individual to fill such vacancy though appointment by the Board[.]" (App. at 344.) But nowhere in the Nominating Committee's charter (or any other constitutive document) is there a requirement that the Board wait for a recommendation from the Nominating Committee before filling a vacancy. The Bylaws state that a vacancy arising from death "shall be filled by a vote of the Majority of the Board of Directors then in office[.]" (App. at 45.) The Board organized a committee to assist in that process, but the Board did not abdicate its appointment power or delegate it to the Nominating Committee.

[9] If the Madonna Directors appoint an ally, then they will also have sufficient numbers (five out of eight) to ratify past acts, including acts taken at the May 13 special board meeting. *See Stone v. Am. Lacquer Solvents Co.*, 345 A.2d 174, 177 (Pa. 1975) (noting that ratification can remedy acts taken at an illegal board meeting).

The Madonna Directors' ability to fill the vacancy with an allied fifth director likely renders irrelevant the parties'

27

interpretation of Section 7 is erroneous, and hence its findings of illegality, oppression, and deadlock – all of which depended on that interpretation – were abuses of discretion. None of those grounds justified appointing a custodian for Republic First.

## 2. Fraudulent Conduct and Waste

Independent of the District Court's declaration that the Madonna Directors were acting ultra vires under the Bylaws, the Court also found that fraud and waste justified the appointment of a custodian. A review of the Court's decision, however, reveals that there was no evidence to justify the drastic remedy of appointing a custodian.

With respect to fraud, the District Court merely opined that the accusations between the two Board factions "suggest widespread self-dealing and dishonesty among the Directors." (App. at 18.) It conceded that it did not actually know "if either accusation is true." (App. at 18.) And that is a serious problem. Mere speculation of fraud will not justify appointing a custodian, particularly when that speculation is based on

---

dispute over the Bylaws' quorum requirement. Article II, Section 15 of the Bylaws defines a quorum as "[a] majority of the members or the entire Board of Directors[.]" (App. at 46.) The Madonna Directors interpret that to mean a majority of the directors then in office; the Hill Directors say that it contains a typo and should instead read "a majority of the members *of* the entire Board." We need not offer an interpretation of that phrase, but Republic First would do well to amend Section 15 to clarify that language.

28

nothing more than the plaintiff's unsupported allegations. *See, e.g.*, *Tyler v. O'Neill*, 1998 WL 695991, at \*3 (E.D. Pa. Oct. 6, 1998) (declining to appoint a custodian where there were "no substantiated allegations of present waste, mismanagement, fraud, or dissipation"), *aff'd*, 189 F.3d 465 (3d Cir. 1999).

With respect to waste, the District Court expressed its concern that the infighting on the Board would "injure both public confidence in the institution and the institution itself." (App. at 18-19.) But it acknowledged that it could not quantify that harm, and it cited no other evidence or even allegation of waste. Potential reputational damage stemming from infighting directors does not come close to the type of waste that justifies appointing a custodian. *See* Principles of Corp. Governance: Analysis & Recommendations § 1.42 (Am. Law Inst. 1994) (defining corporate waste as "an expenditure of corporate funds or a disposition of corporate assets" in exchange for little or no consideration and with no rational business purpose); *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (explaining that, to constitute corporate waste under Delaware law, "the decision must go so far beyond the bounds of reasonable business judgment that its only explanation is bad faith"). A contrary ruling would invite every dissenting director of a Pennsylvania corporation to request a custodian to supplant the governance rules of the company.

The District Court's terse reasoning and the lack of any well-developed evidentiary record expose the insufficient factual basis for the findings of fraud and waste. Appointing a custodian based on those reasons, on the current record, was an abuse of discretion.

## III. CONCLUSION

In conclusion, there were no sound grounds for appointing a custodian for Republic First. The Bylaws obligate a majority of the directors in office to fill the vacancy resulting from Flocco's death, regardless of any quorum requirement. Because the Madonna Directors make up a majority of the directors in office, they "shall" fill the vacancy (App. at 45), and then, with control of a full quorum, they can ratify past acts and transact business on behalf of Republic First – at least until the upcoming annual shareholders' meeting, where the shareholders will have an opportunity to alter the Board's composition. The fact that the Madonna Directors' current conquest of the Board came about through a sad and unexpected event – rather than through a shareholder vote – does not justify judicial intervention. The Bylaws, duly adopted by Republic First's shareholders, provide a contingency plan for this exact situation. By jettisoning that contingency plan and appointing a custodian, the District Court abused its discretion. We will therefore reverse and remand for proceedings consistent with this opinion.